IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CRESTVIEW CLINICAL LABORATORY, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 24-995<br>(Judge Robin M. Meriweather) |

# DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CORINNE A. NIOSI
Assistant Director

GALINA I. FOMENKOVA
Senior Trial Counsel
United States Department of Justice
Civil Division, Commercial Litigation Branch
P.O. Box 480 | Ben Franklin Station
Washington, DC 20044
(202) 514-5495
galina.fomenkova@usdoj.gov

*Attorneys for the United States*

OF COUNSEL

TAMARA CLARK
SUZANNE YURK
National Complex Litigation and
Investigations Division
Office of the General Counsel
U.S. Dept. of Health & Human Services


October 25, 2024

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INDEX TO APPENDIX OF EXHIBITS ..... v

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF THE CASE ..... 2

- I. COVID Relief Statutes And The Uninsured Program ..... 2
  - A. The Uninsured Program ..... 2
  - B. COVID Relief Funding ..... 7
- II. Crestview's Participation In The Uninsured Program ..... 9
- III. Prior Litigation ..... 12
- IV. Current Complaint ..... 12

ARGUMENT ..... 13

- I. Legal Standard ..... 13
- II. The Court Lacks Jurisdiction Over Count IV Because Crestview Has Failed To Identify A Money-Mandating Statute Or Regulation ..... 14
- III. Crestview Does Not Have A Contract, Express Or Implied, With The United States To Receive Reimbursement For Its Claims ..... 19
  - A. Crestview Fails To Plausibly Allege The Formation Of A Contract Obligating HRSA To Pay Crestview's Claims ..... 19
    - 1. Crestview Fails To Plausibly Allege An Unambiguous Offer Or Acceptance By HRSA To Pay Crestview's Claims ..... 19
    - 2. Crestview Fails To Plausibly Allege Consideration For HRSA To Pay Crestview's Claims ..... 22
    - 3. Crestview Fails To Plausibly Allege That Anyone With Actual Authority Bound HRSA To Pay Crestview's Claims ..... 24
    - 4. Crestview Fails To Plausibly Allege That HRSA Intended To Be Contractually Bound To Pay Crestview's Claims ..... 25
    - 5. The Terms And Conditions Do Not Obligate HRSA To Pay Crestview's Claims ..... 28
  - B. Crestview Fails To State A Claim For Breach Of Good Faith And Fair Dealing ..... 30
- IV. Congress's Rescission Of Funding Extinguished Crestview's Claims ..... 31

CONCLUSION ..... 34

TABLE OF AUTHORITIES

FEDERAL CASES

*Acevedo v. United States*,
824 F.3d 1365 (Fed. Cir. 2016)....15, 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....13, 15, 25

*Anderson v. United States*,
344 F.3d 1343 (Fed. Cir. 2003)....19, 20, 21, 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....13

*Bell/Heery v. United States*,
739 F.3d 1324 (Fed. Cir. 2014)....13

*Chattler v. United States*,
632 F.3d 1324 (Fed. Cir. 2011)....27

*City of Cincinnati v. United States*,
153 F.3d 1375 (Fed. Cir. 1998)....26, 27

*Crow Creek Sioux Tribe v. United States*,
900 F.3d 1350 (Fed. Cir. 2018)....15

*Cutler-Hammer, Inc. v. United States*,
441 F.2d 1179 (Ct. Cl. 1971)....27, 28

*Dobyns v. United States*,
915 F.3d 733 (Fed. Cir. 2019)....30, 31

*El Centro v. United States*,
922 F.2d 816 (Fed. Cir. 1990)....22, 23, 24

*Estate of Bogley v. United States*,
514 F.2d 1027 (Ct. Cl. 1975)....21

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005)....14

*Greenlee Cty. v. United States*,
487 F.3d 871 (Fed. Cir. 2007)....31, 32

*Hall v. First Nat'l Bank*,
173 Mass. 16 (1899)....27

*Hanlin v. United States*,
316 F.3d 1325 (Fed. Cir. 2003)....................19, 24

*Hercules Inc. v. United States*,
516 U.S. 417 (1996)....................26

*H. Landau & Co. v. United States*,
886 F.2d 322 (Fed. Cir. 1989)....................24

*Linear Tech. Corp. v. Micrel, Inc.*,
275 F.3d 1040 (Fed. Cir. 2001)....................20, 21

*Lumbermens Mut. Cas. Co. v. United States*,
654 F.3d 1305 (Fed. Cir. 2011)....................26

*Milton v. United States*,
806 F. App'x 996 (Fed. Cir. 2020) ....................30

*Precision Pine & Timber, Inc. v. United States*,
596 F.3d 817 (Fed. Cir. 2010)....................22, 30

*Price v. Panetta*,
674 F.3d 1335 (Fed. Cir. 2012)....................16

*Rocky Mt. Helium, LLC v. United States*,
841 F.3d 1320 (Fed. Cir. 2016)....................14

*Samish Indian Nation v. United States*,
419 F.3d 1355 (Fed. Cir. 2005)....................16

*San Antonio Hous. Auth. v. United States*,
143 Fed. Cl. 425 (2019) ....................15

*Seh Ahn Lee v. United States*,
895 F.3d 1363 (Fed. Cir. 2018)....................22

*Sin Hang Lee v. United States*,
142 Fed. Cl. 722 (2019) ....................20

*St. Bernard Par. Gov't v. United States*,
134 Fed. Cl. 730 (2017) ....................23, 24

*Stephens v. United States*,
884 F.3d 1151 (Fed. Cir. 2018)....................13

*Texas v. United States*,
537 F.2d 466 (Ct. Cl. 1976) ....................32

*Terry v. United States*,
103 Fed. Cl. 645 (2012) ..........14

*Trauma Serv. Grp. v. United States*,
104 F.3d 1321 (Fed. Cir. 1997)..........19, 26, 28

*Turping v. United States*,
913 F.3d 1060 (Fed. Cir. 2019)..........25

*United States v. Navajo Nation*,
556 U.S. 287 (2009)..........15

*United States v. Sherwood*,
312 U.S. 584 (1941)..........14

STATUTES

28 U.S.C. § 1491..........14

American Rescue Plan Act,
Pub. L. 117-2, 135 Stat. 4 (Mar. 11, 2021)..........9, 17

CARES Act,
Pub. L. 116-136, 134 Stat. 281 (Mar. 27, 2020)..........8, 9, 17

Consolidated Appropriations Act,
Pub. L. 116-260, 134 Stat. 1182 (Dec. 27, 2020)..........8

Families First Coronavirus Response Act,
Pub. L. 116-127, 134 Stat. 178 (Mar. 18, 2020)..........7, 18

Fiscal Responsibility Act of 2023,
Pub. L. 118-5, 137 Stat. 10 (June 3, 2023)..........3, 33, 34

Paycheck Protection Program and Health Care Enhancement Act,
Pub. L. 116-139, 134 Stat. 620 (Apr. 24, 2020)..........7, 8, 17, 18

OTHER AUTHORITIES

U.S. Const., Art. I, Sec. 9, Cl. 7..........31

A Glossary of Terms Used in the Federal Budget Process,
GAO-05-734SP..........16, 34

Restatement (Second) of Contracts..........19, 20, 21

1 Williston, Contracts (3d ed. 1957)..........20

INDEX TO APPENDIX OF EXHIBITS

FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration .......... A1

Webinar: HRSA COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration of the Uninsured .......... A30

Terms and Conditions: Families First Coronavirus Response Act .......... A63

Terms and Conditions: Provider Relief Fund & American Rescue Plan Act (June 1, 2021–December 17, 2021) .......... A75

Terms and Conditions: Provider Relief Fund & American Rescue Plan Act (December 17, 2021–end) .......... A86

Sample Batch Upload Attestations .......... A98

Standard Operating Procedure for Holding Claims and Conducting Assessments for Providers on Hold for the Uninsured Program .......... A100

Crestview Hold and Full Assessment Notification (March 18, 2022) .......... A104

Crestview Assessment Report (April 15, 2024) .......... A106

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully requests that the Court dismiss the complaint of plaintiff, Crestview Clinical Laboratory, LLC (Crestview), for lack of jurisdiction and for failure to state a claim upon which relief can be granted.

The uninsured program administered by the Health Resources and Services Administration (HRSA) at the heart of Crestview's complaint was an assistance fund, not a payment guarantee. Undoubtedly, the possibility of being reimbursed by the Government lowered the barrier for testing of uninsured individuals for COVID-19 and thereby furthered the public health response to the pandemic. In that sense, the uninsured program, and other provider relief funds administered by the Department of Health and Human Services (HHS), were classic examples of the unique power and responsibility of the Federal Government to support the nation in times of crisis. Equally undoubtedly, Crestview directly benefitted from this assistance fund, receiving close to $100 million in reimbursed claims.

But the programs did not create entitlements for, or commercial arrangements with, Crestview. Congress expanded HHS's budget, giving the Secretary of HHS the discretion to incur additional obligations against the newly appropriated funds. But Congress did not commit the Federal Government to covering, much less unconditionally covering, the cost of testing for all uninsured individuals. And HRSA was not purchasing services from Crestview for its own benefit—nor, critically, was it undertaking or promising to reimburse any given claim. Moreover, the existence of the uninsured program, and the payment of any claims under that program, was expressly conditioned on the availability of funds, which Congress explicitly rescinded in June 2023, thereby terminating the program. In short, Crestview cannot show entitlement to any more Federal funding than it has already received.

## STATEMENT OF THE ISSUES

1. Whether Crestview has identified a money-mandating source of law necessary to invoke this Court's jurisdiction under the Tucker Act.

2. Whether Crestview has plausibly alleged the formation of a contract obligating HRSA to pay Crestview's claims.

3. Whether Congress's rescission of the COVID-19 relief appropriations, including those supporting the uninsured program, extinguished any liability for Crestview's claims.

## STATEMENT OF THE CASE

### I. COVID Relief Statutes And The Uninsured Program

#### A. The Uninsured Program

The uninsured program—officially called "COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program" or sometimes referred to as "UIP"—was one of several monetary assistance funds established to support healthcare providers during the COVID-19 pandemic. *See* https://www.hrsa.gov/provider-relief/about. The program was administered by HRSA, which is a component within HHS that "provides equitable health care to the nation's highest-need communities." *See* https://www.hrsa.gov/. Subject to the availability of funds (discussed below), the uninsured program, as the name suggests, reimbursed eligible healthcare providers for testing, treatment, and vaccine administration for COVID-19 provided to individuals who did not have any health care coverage at the time the provider rendered the services. *See* "HRSA COVID-19 Claims Reimbursement for the Uninsured Program and the COVID-19 Coverage Assistance Fund," Assistance Listing No. 93.461, https://sam.gov/fal/a7400440900c426e9a77cd6c15bf51ea/view; HRSA About (Archived), https://public3.pagefreezer.com/browse/health-resources-and-services-administration/11-12-2023T14:31/https:/www.hrsa.gov/provider-relief/

about/covid-uninsured-claim. Crestview's claims in this case concern reimbursement for COVID-19 testing.

Participation in the program was voluntary. That is, HRSA did not require any healthcare provider to provide services for uninsured patients, but for those healthcare providers who *did* choose to provide such services, they could submit claims for reimbursement to HRSA. Claims were processed and, if approved, paid on a rolling basis, subject to the availability of funds. The final deadline to submit testing claims was March 22, 2022. Compl. ¶ 32. Subsequently, Congress rescinded the remaining unobligated funds effective June 3, 2023, and consequently HRSA stopped processing submitted claims on that date because as of June 3, 2023, funding was, by definition, no longer available. *See* Fiscal Responsibility Act of 2023, Pub. L. 118-5, Div. B, Title I, § 2(3), (4), (5), (15), 137 Stat. 23–24 (June 3, 2023); https://sam.gov/fal/a7400440900c426e9a77cd6c15bf51ea/view ("With the passage of the Fiscal Responsibility Act of 2023 and related rescission of program funds, no additional claims payments will be made under the Uninsured Program."). Congress has not appropriated any new funds to resume reimbursement under the uninsured program. All told, during its lifetime, HRSA paid out approximately $24.5 billion in reimbursements to eligible healthcare providers for COVID-19 testing, treatment, and vaccination services through the uninsured program; Crestview specifically received approximately $100 million.[1] *See* https://www.hrsa.gov/provider-relief/

[1] These numbers represent the money HRSA initially paid out and does not account for funds that were improperly paid and therefore subject to recoupment. *See*, *e.g.*, A113 (finding that approximately $6 million in reimbursements already made to Crestview were unallowable and needed to be returned); OIG Report No. A-02-21-01013, available at https://oig.hhs.gov/documents/audit/6536/A-02-21-01013-Complete%20Report.pdf ("On the basis of our sample results, we estimated that nearly $784 million of $4.2 billion (or 19 percent) in UIP payments made to providers during our audit period for approximately 3.7 million of 19.2 million patients were improper.").

about; https://data.cdc.gov/Administrative/Claims-Reimbursement-to-Health-Care-Providers-and-/rksx-33p3/data_preview.

The uninsured program built upon existing infrastructure for claim submission and reimbursement—generally aligning with Medicare processes, pricing, and codes (though the program was never part of Medicare). In particular, claim submission occurred through the Medicare Electronic Data Interchange (MEDI) system, which was the existing platform used by health care providers to submit claims for payment to payors, such as health insurance companies and Government programs like Medicare. HRSA also contracted with UnitedHealth (or, later, one of its divisions) to help administer the program. All substantive decisions, including specific allocation of available funding, coverage, reimbursement, eligibility determinations, and claim adjudication policies remained within HRSA's sole control. *See* A35.

The structure of the program was as follows:

*First*, in order to be able to submit claims for reimbursement for eligible services, the healthcare provider had to enroll in the program through the online UIP Portal. *See* https://coviduninsuredclaim.linkhealth.com/.[2] Enrollment required the healthcare provider to submit their Taxpayer Identification Number, link a bank account for direct deposit, and, if the healthcare provider was not already doing business with UnitedHealth, submit a provider roster (*i.e.* a list of individual healthcare providers who would actually provide the services/treatment). https://web.archive.org/web/20220307010936/https://coviduninsuredclaim.linkhealth.com/what-you-need.html; A43–50. This provider enrollment step was only necessary once—upon being enrolled, a healthcare provider could submit claims on a rolling basis, whereas steps two through

[2] Because the program is no longer operational, the portal has been shutdown. A sample archived version of the portal from when the program was accepting claims can be found, *e.g.*, at https://web.archive.org/web/20220307010936/https://coviduninsuredclaim.linkhealth.com/.

five needed to be repeated with each submission.

*Second*, the enrolled provider would submit a patient roster and attest that it will comply with HSRA's terms and conditions associated with receiving payment, also through the UIP Portal. A51. The patient roster was to contain details about the patient and the service: name, date of birth, gender, social security number (or state identification number), date of service, address, etc. https://web.archive.org/web/20220307010936/https://coviduninsuredclaim.linkhealth.com/patient-details.html. This information was required to confirm that the patient was uninsured and that the services were not subject to reimbursement from other sources.

The terms and conditions imposed binding obligations on the "recipients" of funds and reflected the requirements that Congress imposed as conditions on the use of the money that HSRA was distributing; because, as discussed below, the statutory appropriation from which funding was allocated to the uninsured program changed over time, the applicable terms and conditions also varied somewhat over time. *See* A63–74; A75–85; A86–97 (in effect from Dec. 17, 2021 through the end of the program). All versions of the terms and conditions were directed to "the Recipient"—defined as "the healthcare provider, whether an individual or an entity, receiving the Payment"—who "plans to submit claims for reimbursement," A63; A75–76; A86, A88, and included, *inter alia*, certifications that the patient was uninsured at the time the claimed services were rendered, situations in which the money would have to be returned, and other commitments by the healthcare provider in the event that claims are paid, *e.g.*, not to balance bill the patient, to return any payment previously collected from the patient, to comply with record-keeping and audit requests, etc.

The terms and conditions further specified that the reimbursement rate would generally be based on the current year Medicare fee schedule unless specified elsewhere. A66; A78; A89.

And the terms and conditions set forth other statutory provisions—not connected to the COVID-19 relief appropriations specifically—that would also apply, *e.g.* Privacy Act, confidentiality, whistleblower protections, etc. A66–74; A79–84; A90–96.

*Third*, once a provider successfully uploaded a patient roster into the UIP Portal, UnitedHealth analyzed the patient information as submitted by the provider to verify eligibility and issued a unique temporary patient ID for every verified patient. A52. If the verification process identified that the patient had healthcare coverage at the time of service, a temporary patient ID was not issued for that patient. *See* https://web.archive.org/web/20220307010936/ https://coviduninsuredclaim.linkhealth.com/patient-details.html. The issuance of a temporary patient ID, therefore, took place prior to claim submission—having a temporary patient ID did not indicate a claim had been submitted and did not itself signify that any claim was valid or would be paid.

*Fourth*, after a temporary patient ID number was generated and assigned, the healthcare provider could proceed to submit a claim for that patient. Claims were submitted through MEDI. All claims were required to be submitted through this system, and all submitted claims were required to be complete and final. *See* A54; https://web.archive.org/web/20220307010936/ https://coviduninsuredclaim.linkhealth.com/claims-and-reimbursement.html; A20–21 (UIP FAQs) ("Q. Can providers submit a paper reimbursement request and/or request reimbursement by check? A. No. All claims submissions and claims reimbursements must be submitted and remitted electronically.").

*Fifth*, once a claim was submitted through MEDI it was validated and adjudicated by UnitedHealth and, if appropriate, UnitedHealth sent a payment request for approval to HRSA. If HRSA approved the payment request, a direct deposit would be made from the available funds to

the provider. The rate of reimbursement was generally based on the current year Medicare fee schedule, and, as a condition of receiving funding through the uninsured program, the provider was required to accept the payment received as payment in full and could not seek any additional reimbursement from any other source. If the claim was not paid, the healthcare provider was not prohibited from seeking payment from the patient directly.

B. COVID Relief Funding

Broadly speaking, the uninsured program was funded through three buckets of allocated appropriations:

*First*, Congress made two appropriations for reimbursement of claims for services provided to uninsured individuals specifically. In the Families First Coronavirus Response Act, Congress appropriated $1 billion "to remain available until expended" to the Public Health and Social Services Emergency Fund[3] "to pay the claims of providers for reimbursement" for COVID-19 related services for "uninsured individuals." Pub. L. 116-127, Title V, 134 Stat. 182 (Mar. 18, 2020). And in the Paycheck Protection Program and Health Care Enhancement Act, Congress appropriated $25 billion, also "to remain available until expended," for various COVID-19-testing expenses. Pub. L. 116-139, Div. B, Title I, 134 Stat. 623–24 (Apr. 24, 2020). Congress earmarked "up to" $1 billion of that $25 billion lump sum as money that "may be used to cover the cost of testing for the uninsured." 134 Stat. 626. HRSA stopped using these $2

[3] The "Public Health and Social Services Emergency Fund" is a discretionary appropriation account available to the Secretary of HHS that pre-dates the COVID-19 pandemic. This account receives both annual appropriations, for a broad range of preparedness and response activities, and supplemental appropriations to address specific emergencies. In addition to some of the COVID-19-related relief, Congress has used this fund to provide HHS with funding in response to, *e.g.*, the 2009 outbreak of the H1N1 pandemic influenza, the 2010 Haiti Earthquake, the 2012 Hurricane Sandy, the 2014 Ebola outbreak, and the Zika outbreak in 2016.

billion in dedicated uninsured funds for direct claim reimbursement in early March 2021.[4]

*Second*, Congress made a series of lump sum appropriations to the Public Health and Social Services Emergency Fund "to remain available until expended" "to prevent, prepare for, and respond to coronavirus, domestically or internationally, for necessary expenses to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." CARES Act, Pub. L. 116-136, Title VIII, 134 Stat. 563 (Mar. 27, 2020) ($100 billion); Paycheck Protection Program and Health Care Enhancement Act, Pub. L. 116-139, Div. B, Title I, 134 Stat. 622 (an additional $75 billion, separate from the $1 billion or $25 billion discussed above); Consolidated Appropriations Act, Pub. L. 116-260, Div. M, Title III, 134 Stat. 1920 (Dec. 27, 2020) ($3 billion).[5] HHS used these appropriations to set up the Provider Relief Fund. Although Congress did not earmark any of these appropriations for uninsured patients specifically, the Secretary of HHS, in his discretion, allocated a portion of that funding to the uninsured program.

Congress afforded the Secretary of HHS broad discretion in how to spend these appropriations—including, for example, whether payments would be made as "a pre-payment, prospective payment, or retrospective payment"—but it did impose certain conditions on the use of this money. *See* 134 Stat. 563–64. For example, Congress explicitly prohibited using the

---

[4] HRSA had obligated the full $1 billion earmarked in the Paycheck Protection Program and Health Care Enhancement Act on claim reimbursement and had allocated the full $1 billion from the Families First Coronavirus Response Act for claims reimbursement and necessary costs to administer the uninsured program.

[5] The Consolidated Appropriations Act is also the first time that Congress referred to this subset of the Public Health and Social Services Emergency Fund as the Provider Relief Fund. 134 Stat. 1921. No part of the $3 billion appropriated in this act was used to reimburse claims for uninsured individuals. Crestview does not cite this act in its complaint and it will not be discussed further in this motion.

appropriations "to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse." *Id*. Congress also provided that "the Secretary of Health and Human Services, shall, on a rolling basis review applications and make payments," which "shall be made in consideration of the most efficient payment systems practicable" and that "to be eligible for a payment" "an eligible healthcare provide shall submit to the Secretary of Health and Human Services an application that includes a statement justifying the need of the provide for the payment . . . and have a valid tax identification number." *Id*. And Congress imposed reporting requirements—both from HHS to Congress, and from the recipients of the payments to HHS. *Id*.

*Third*, in the American Rescue Plan Act, Congress made a lump sum appropriation of $47.8 billion, "to remain available until expended, to carry out activities to detect, diagnose, trace, and monitor SARS-CoV-2 and COVID-19 infections and related strategies to mitigate the spread of COVID-19." Pub. L. 117-2, Sub. E, § 2401, 135 Stat. 40 (Mar. 11, 2021). Once again, Congress left specific spending decisions to the discretion of the Secretary, setting out seven broad categories of "testing, contact tracing, and mitigation activities" that the funds could be used for, including "implementing a national, evidence-based strategy for testing" and "support[ing] the development, manufacturing, procurement, distribution, and administration of tests to detect or diagnose" COVID-19. 135 Stat. 40–41. This appropriation was separate from and not used to support the Provider Relief Fund, nor did it earmark any funds specifically for reimbursement of services for uninsured individuals, but the Secretary, in his discretion, allocated a portion of this funding to the uninsured program as well.

## II. Crestview's Participation In The Uninsured Program

Crestview enrolled in the uninsured program. Compl. ¶ 23. It submitted claims that were adjudicated on a rolling basis by HRSA, and as of January 2022, it had been reimbursed with

approximately $100 million in relief funding. *See* https://data.cdc.gov/Administrative/Claims-Reimbursement-to-Health-Care-Providers-and-/rksx-33p3/data_preview. In January 2022, HRSA became aware of allegations and investigations launched by the City Attorney of San Francisco into Crestview's participation in "pop-up" COVID-19 testing sites. *See generally* San Francisco City Attorney Subpoenas Companies Behind Pop-Up COVID-19 Test Sites, NBC Bay Area, available at https://www.nbcbayarea.com/investigations/consumer/san-francisco-city-attorney-subpoenas-companies-behind-pop-up-covid-19-testing-sites/2783444/ (Jan. 20, 2022). The reporting raised sufficient program integrity concerns that HRSA began an internal review of Crestview's claims.

On January 27, 2024, Crestview was placed on an initial 30-business day preliminary hold, consistent with HRSA's standard operating procedures, as its claims reflected improbable quantities on a single date of service. *See* Compl. ¶ 29; A101. As a result of that hold—which was subsequently extended while HRSA conducted its full assessment of Crestview—HRSA paused the adjudication of Crestview's pending and newly submitted claims, stopped payment on any unpaid claims, and reversed payment on claims that were in the process of being directly deposited just before or as the hold went into effect. *See* Compl. ¶¶ 29–31. As per its standard operating procedures, HRSA notified Crestview that it "instructed its contractor to pause processing your pending claims" and that "HRSA may hold pending claims for 90 days following receipt of the documentation, or longer if needed, to complete review of the documentation." A105; *see* A100 (SOP) (setting out "criteria for identifying circumstances to hold pending claims for a preliminary payment hold (up to 30 business days) or an extended payment hold (up to 90 business days or through the duration of the assessment)").

HRSA proceeded to conduct an assessment of Crestview's compliance with the program's requirements. In January 2024, HRSA shared preliminary findings with Crestview that identified several areas of noncompliance with the terms and conditions. Specifically, the preliminary assessment identified five "nonconformities" where Crestview "failed to meet program requirements" and was required to return funds and one "observation" where a problem existed but return of funds was not required based on a random sample of Crestview's claims. *See* A131. The preliminary findings extrapolated from that sample to conclude that Crestview would owe $26 million to HRSA. *Id*.

Crestview submitted a response to those preliminary findings. In particular, Crestview challenged HRSA's extrapolation because HRSA intended to only audit paid claims, and Crestview argued that a portion of the claims reviewed had not been paid or had been reversed (now disputed here). *See* A132; Compl. ¶¶ 30–31. HRSA revised its extrapolated calculations to adjust for these claims and responded to Crestview's other disagreements. The revised final assessment continued to find noncompliance with the program's terms and conditions. Specifically, Crestview was found to have "billed [] for insured patients," that it "did not provide supporting documentation to validate submitted claims," and "submitted claims with inconsistent data in different supporting documentation." A113. The assessment also observed a systemic problem that Crestview was "not collect[ing] insurance information during intake." *Id*. Based on these findings, HRSA extrapolated that Crestview received approximately $6 million in reimbursements that were not allowable and had to be returned. *Id*. Crestview has requested further review of the assessment and this process is currently underway.

The purported $69 million in new claims that Crestview seeks to recover now fall into the

following categories:

| Approximate Value | Claim Status | Obligation of Funds |
|---|---|---|
| $5 million | Never submitted | Never obligated |
| $56 million | Submitted, but not adjudicated | Never obligated |
| $3.6 million | Adjudicated; payment stopped | Never obligated |
| $3.4 million | Adjudicated; payment reversed | Deobligated |

III. Prior Litigation

On October 10, 2023, Crestview filed suit in the U.S. District Court for the Central District of California. *See* Case No. 8:23-cv-01913 (C.D. Cal.). In a thirteen-count complaint, Crestview sought mandamus, declaratory, and injunctive relief aimed at obtaining HRSA's assessment report and the same $69 million dollars it now seeks in this Court. *Id.* at ECF 1. On April 25, 2024, having received both the preliminary findings and the final assessment report, Crestview filed an amended complaint dropping the assessment-related claims and keeping just the claims aimed at recovering the $69 million. *Id.* at ECF 18. On June 21, 2024, before any responsive pleading was filed, Crestview voluntarily dismissed the amended complaint in its entirety. *Id.* at ECF 22.

IV. Current Complaint

Crestview filed its complaint in this Court six days after voluntarily dismissing its complaint in district court. In Counts I and III, Crestview alleges that the terms and conditions to which it was required to attest prior to any claim submission constituted an express contract obligating HRSA to both adjudicate and pay all of Crestview's claims. Compl.¶¶ 23, 52, 67. Count I alleges breach of that "contract" by HRSA "imposing a pause" on Crestview during the assessment, and "failing and refusing to pay" Crestview's claims notwithstanding Congress's recission of funds, *id.* at ¶¶ 23, 52; Count III alleges breach of the duty of good faith and fair dealing implied in that "contract" by delaying the assessment and then not paying Crestview's claims notwithstanding Congress's recission of funds, *id.* at ¶¶ 23, 72. In Count II, Crestview

alleges an implied in fact contract "obligati[ng] [HRSA] to reimburse Crestview for COVID-19 testing services furnished to the uninsured population," with the same breach allegation as in Count I. *Id*. at ¶¶ 56, 63. And in Count IV, Crestview alleges that either the appropriation statutes themselves, or the "regulatory framework" of HRSA's terms and conditions, website guidelines, and the appropriation statutes together "mandate[d]" HRSA "to reimburse Crestview's claims." *Id*. at ¶¶ 76, 77.

The premise underlying Crestview's claims in all its counts before this Court is fundamentally the same (and the same as it was when it sued for the same $69 million in district court): that the funds allocated to fund the uninsured program *generally*—and since rescinded—somehow become and remained obligated to Crestview *specifically*.

## ARGUMENT

### I. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018). On a motion for failure to state a claim, "the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant." *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014). In either case, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or conclusory "naked assertions devoid of further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Iqbal*, 556 U.S. at 678 (cleaned up).

In addition, "the court is not required to accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Terry v. United States*, 103 Fed. Cl. 645, 652 (2012) (quotation omitted). "The Supreme Court has ruled that a court 'must consider the complaint in its entirety, . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Rocky Mt. Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (alteration in original); *see Terry*, 103 Fed. Cl. at 652 ("[D]ocuments appended to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.") (quotation omitted).

## II. The Court Lacks Jurisdiction Over Count IV Because Crestview Has Failed To Identify A Money-Mandating Statute Or Regulation

"The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citation omitted). "Except as Congress has consented there is no jurisdiction in the Court of Claims." *Id*. at 587–88. The Tucker Act is the primary source of this Court's jurisdiction and concomitant necessary waiver of sovereign immunity. *See* 28 U.S.C. § 1491(a)(1); Compl. ¶¶ 15–16. But the "Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). It is well-established that "the absence of a money-mandating source [is] fatal to the court's jurisdiction under the Tucker Act." *Id*. at 1173.

In Count IV of its complaint, Crestview alleges that the "UIP Funding Laws"—which Crestview defines as the general combination of the CARES Act, the Families First Coronavirus Response Act, the Paycheck Protection Program and Health Care Enhancement Act, and the

American Rescue Plan Act—mandate the payment of Crestview's claims. Compl. ¶ 76; *see* Compl. ¶ 9. In the alternative, Crestview alleges that these "UIP Funding Laws" together with "the Terms and Conditions, UIP Process Training, UIP FAQs and guidelines and website" created a "regulatory framework" that mandates payment. Neither argument passes muster.

At the outset, Crestview fails to identify any specific portion of any of the statutes (or HRSA's other public statements) that it contends mandates the payment of money. That failure alone is sufficient for the Court to dismiss. It is Crestview that has the burden to establish jurisdiction, and its "naked" legal conclusion that HRSA was obligated to pay based on general references to appropriations laws—without any substantiating detail—is insufficient to carry that burden even at the pleading stage. "[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (cleaned up); *see Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1354–55 (Fed. Cir. 2018) ("[W]e join the majority of our sister circuits in holding that the Supreme Court's 'plausibility' requirement for facial challenges to claims under Rule 12(b)(6), as set out in [*Twombly* and *Iqbal*] also applies to facial challenges to subject-matter jurisdiction under Rule 12(b)(1)."). To meet its pleading burden, more is required from Crestview than merely citing generally to these statutes and declaring them "money mandating."

In any event, the appropriations laws Crestview generally invokes cannot "fairly be interpreted as mandating compensation by the Federal Government." *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009). At the outset, "[a]ppropriation acts, by their very nature, are generally money-authorizing, not money-mandating." *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 480 (2019); *see Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (differentiating between statutes that are "merely money-*authorizing*"—which is not

sufficient for Tucker Act jurisdiction—and those that are "money-*mandating*") (emphasis added). As the GAO Glossary of Terms Used in the Federal Budget Process explains: "Appropriations do not represent cash actually set aside in the Treasury for purposes specified in the appropriation act; they represent amounts that agencies *may obligate* during the period of time specified in the respective appropriation acts." GAO-05-734SP at 20-21 (emphasis added). That describes the statutes at issue here perfectly: they authorized the Secretary of HHS to incur obligations within his discretion for certain purposes; but in authorizing the additional emergency appropriations, Congress did not incur any obligations directly.

The Federal Circuit has long held that "[a] statutory or regulatory provision that grants a government official or agency substantial discretion to decide whether to expend government funds in a particular way is not considered money-mandating and does not create a cause of action that can be prosecuted under the [] Tucker Act." *Price v. Panetta*, 674 F.3d 1335, 1339 (Fed. Cir. 2012). The appropriations statutes at issue here are the very definition of "grant[ing] [the Secretary of HHS] substantial discretion" on whether, how, and to whom to expend the appropriated funds. Nor do any of the authorizing appropriations provide clear standards for paying claims, state the precise amounts that must be paid, or could otherwise be interpreted as compelling payment upon satisfaction of certain conditions. *See Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005).

At the outset, Congress did not even *earmark any* of the funding that went into the Provider Relief Fund or was appropriated in the American Rescue Plan Act for the uninsured program. The Secretary's choice to allocate some of those funds toward the uninsured program *at all* was an exercise wholly within his discretion.

The statutes authorizing appropriations that became the Provider Relief Fund are

permeated throughout with broad grants of Secretarial discretion. These statutes appropriated money "to remain available until expended, to prevent, prepare for, and respond to coronavirus, domestically or internationally, for necessary expenses to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." 134 Stat. 563; 134 Stat. 622. Nothing about that language *mandates* that the appropriated funds be spent on any particular claim—much less *Crestview's* claims, even assuming they were all submitted, under the uninsured program. "[T]o be eligible for a payment under this paragraph," the statutes further require "an eligible health care provider [to] submit to the Secretary of Health and Human Services an *application* that includes a statement justifying the need of the provider for the payment." 134 Stat. 563; 134 Stat. 623 (emphasis added). And Congress left it up to the *Secretary* to, "on a rolling basis, review applications and make payments under this paragraph in this Act," allowing payments to be made as "pre-payment, prospective payment, or retrospective payment, *as determined appropriate by the Secretary*." *Id*. (emphasis added).

The American Rescue Plan Act was no less discretionary. Congress appropriated funds "to remain available until expended, to carry out activities to detect, diagnose, trace, and monitor SARS-CoV-2 and COVID-19 infections and related strategies to mitigate the spread of COVID-19," and articulated seven categories for which the money could be used. 135 Stat. 40–41. One of those categories was to "support the development, manufacturing, procurement, distribution, and administration of tests to detect or diagnose SARS-CoV-2 and COVID-19." 135 Stat. 40. Although allocating a portion of these funds to the uninsured program was therefore permitted by Congress, there is nothing in that authorization that mandated the payment of any of Crestview's (or any provider's) claims.

And even with respect to the two appropriations Congress specifically made available "to pay the claims of providers for reimbursement . . . for uninsured individuals," those statutes, although narrowest in the scope of their authorization, were no more money-mandating. The Families First Coronavirus Response Act contains no words of *obligation* mandating the reimbursement of any particular claim, much less Crestview's. *See* 134 Stat. 182. The provision in the Paycheck Protection Program and Health Care Enhancement Act that earmarked funds was even more lax. It did not require that any funds be expended at all, merely authorizing that "up to $1,000,000,000 of funds provided under this paragraph in this Act *may* be used to cover the cost of testing for the uninsured." 134 Stat. 626 (emphasis added).

In addition, consistent with their money-authorizing rather than money-mandating nature, all these statutes provided lump sum appropriations. These discretionary appropriations for fixed limited amounts, therefore, had to envision that not every theoretically eligible claim or application necessarily could or would be paid. At bottom, the so-called "UIP Funding Laws" gave HRSA appropriations against which the agency could incur future obligations—but did not themselves establish any obligations and cannot, therefore, support this Court's jurisdiction under the Tucker Act.

Finally, Crestview's attempt to supplement the appropriations statutes with HRSA's other public statements about the operation of the uninsured program cannot bridge the gap to establish a money-mandating "regulatory framework" here. *See* Compl. ¶ 77. HRSA did not promulgate regulations implementing the uninsured program. And HRSA's informational statements designed to educate the public about how to submit claims and which claims would be eligible for payment—even if they could have the force of law—cannot be fairly interpreted as committing HRSA to pay any given claim, much less all submitted claims. Moreover, these

public statements only reiterated that any reimbursement would be subject to the availability of funds. *See*, *e.g.*, A3; A31–60; A98–99; *see also* Section IV, below.

Thus, Crestview has failed to identify a money-mandating statute or regulation, and the Court lacks jurisdiction over Count IV of the complaint.

## III. Crestview Does Not Have A Contract, Express Or Implied, With The United States To Receive Reimbursement For Its Claims

### A. Crestview Fails To Plausibly Allege The Formation Of A Contract Obligating HRSA To Pay Crestview's Claims

Counts I–III of Crestview's complaint are premised on the existence of a contract—either expressed or implied in fact—purporting to obligate HRSA to pay Crestview for all the claims it submitted, and for that matter, some that it did not submit. But Crestview fails to plausibly allege the formation of such a contract. "[T]he requirements for an implied-in-fact contract are the same as for an express contract." *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003). Crestview must plausibly allege (and ultimately prove) "(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract." *Id*. And "a breach of contract is a failure to perform a contractual duty when it is due." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Thus, in this case, Crestview must plausibly allege the formation of a contract obligating HRSA to pay its claims. Crestview fails to do so with respect to *any* of the elements of contract formation, but the absence of any one alone is sufficient to mandate dismissal.

#### 1. Crestview Fails To Plausibly Allege An Unambiguous Offer Or Acceptance By HRSA To Pay Crestview's Claims

Both implied-in-fact contracts and express contracts must begin with an offer. An "offer is made by 'the manifestation of willingness to enter into a bargain, so made as to justify another

person in understanding that his assent to that bargain is invited and will conclude it.'" *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003) (quoting Restatement (Second) of Contracts § 24). An offer "must be a promise," made with the intent to be bound by that promise. *Estate of Bogley v. United States*, 514 F.2d 1027, 1032–33 (Ct. Cl. 1975) (quoting 1 Williston, Contracts § 26 (3d ed. 1957)). By contrast, "a mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer." *Id*.

Crestview alleges that HRSA was the one to issue an offer here—"offering to reimburse [healthcare providers for testing of the uninsured] at Medicare rates" and "Crestview responded to the Agency's offer." Compl. ¶ 57; *see id*. at ¶ 27 (alleging that "HRSA expressly promised that HHS would provide claims reimbursement to health care providers for testing uninsured individuals for COVID-19"). But Crestview fails to plead any facts—or indeed identify any specifics of who, how, when, or where it believes an "offer" occurred—that would plausibly suggest that HRSA was offering to be bound to pay Crestview's claims here.

At best, HRSA was inviting healthcare providers generally to submit applications that *if approved*, and funds were available, could result in payment. The UIP FAQs spoke in terms of healthcare providers and services that were "eligible" for reimbursement, not "entitled" to it and the Webinar invited healthcare providers to submit claims that would then require further adjudication and approval before any payment could be remitted, subject to the availability of funds. A3; A30–62. As this court has long held, "mere solicitations, invitations, or instructions from the government are not offers to contract that can bind the government." *Sin Hang Lee v. United States*, 142 Fed. Cl. 722, 731 (2019) (collecting cases), *aff'd* 819 F. App'x 908 (Fed. Cir. 2020). Even "[a] manifestation of willingness to enter into a bargain is not an offer if the person

to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001) (quoting Restatement (Second) of Contracts § 26). And without an offer, "there is nothing [for Crestview] to accept." *Estate of Bogley*, 514 F.2d at 1036.

Nor can Crestview's submission of claims, or attestation to the terms and conditions prior to submission of a claim, constitute acceptance. "Acceptance" requires "manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." *Anderson*, 344 F.3d at 1355 (quoting Restatement (Second) of Contracts § 50(1)). Acceptance, to be valid, "must be made absolutely and unqualifiedly," and "must *objectively* manifest the offeree's assent." *Anderson*, 344 F.3d at 1357 (quoting *Estate of Bogley*, 514 F.2d at 1032); *Linear Tech.*, 275 F.3d at 1053 (emphasis in original).

Here, Crestview would have attested to the terms and conditions *before* it submitted a claim to which those terms and conditions would apply, and even after attesting to the terms and conditions, Crestview was not required to submit a claim at all. And even if Crestview did submit a claim, there is no dispute that mere submission was not enough. Crestview concedes that "[a]djudication and approval of Crestview's COVID-19 UIP testing services, including determination of the quantifiable amount due to Crestview," was necessary for there to be a "legal liability to pay." Compl. ¶ 17. These further steps Crestview must take after it attests to the terms and conditions, coupled with the further steps HRSA must take if Crestview actually submits a claim and before any reimbursement could issue, all preclude the formation of a contract by HRSA to pay the bulk of Crestview's claims here. Aside from the $3.4 million that, accepting Crestview's allegations as true, was actually deposited and then reversed, *see*

Compl. ¶ 30, there is no dispute that HRSA did not obligate or remit payment to Crestview on any of the other claims at issue.[6] Indeed, for $5 million of claims Crestview seeks to recover on now, it did not even complete claim submission. *See* ECF 1 at ¶ 26, Case No. 8:23-cv-01913 (C.D. Cal.) ("Crestview attempted to submit approximately $5 million in additional claims . . . however . . . the online claims portal did not process the claims submissions to completion.").

2. Crestview Fails To Plausibly Allege Consideration For HRSA To Pay Crestview's Claims

Crestview alleges that it "provided a real and substantial benefit to the Agency by agreeing to participate in the UIP and delivering timely COVID-19 testing services to the uninsured." Compl. ¶ 60. But as Crestview's allegation itself admits, the testing services were provided to the *uninsured*, *not* to HRSA; and Crestview's participation in the uninsured program was a benefit *to Crestview* (to the tune of $100 million), *not* HRSA. To be sure, HRSA hoped the uninsured program would lower the barriers to testing for uninsured individuals and believed that doing so would further its overall public health mission in addressing the pandemic emergency, but as this Court and the Federal Circuit have held, that kind of generalized benefit is insufficient to support contract formation.

For example, in *El Centro v. United States*, the El Centro Community Hospital treated 14 illegal aliens, who were injured when the vehicle in which they were riding crashed while

---

[6] Because, accepting Crestview's allegations as true, it appears that payment was initially deposited for these claims, at this time, we are only seeking dismissal of Count I with respect to this $3.4 million for the reasons stated in Section IV. Counts II and III should still be dismissed with respect to all claims, even if the terms and conditions were to ripen into an express contract when payment is made. "It is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." *Seh Ahn Lee v. United States*, 895 F.3d 1363, 1370 (Fed. Cir. 2018) (quotation omitted, collecting cases). So too "[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010).

attempting to flee from Border Patrol agents and sought to recover the costs of that treatment. 922 F.2d 816, 817 (Fed. Cir. 1990). Although the Federal Circuit found the hospital's case to be sympathetic, it held that, as a matter of law, the Government was not required to reimburse those costs. Among other reasons, the Federal Circuit specifically held that there was no consideration. "Because the Government was not required to provide care to the aliens, the care provided by [the hospital] benefited the aliens, not the Government. Therefore, the Government received no consideration to support [a] contract." *Id*. at 823. So too here, HRSA was not required to provide testing services for the uninsured and the testing services provided by Crestview were for the benefit of the *uninsured*, *not* HRSA.

Similarly, in *St. Bernard Par. Gov't v. United States*, St. Bernard Parish and the Natural Resources Conservation Service entered into a written cooperative agreement pursuant to which the Parish would contract for the removal of sediment in the Bayou Terre Aux Beoufs in the aftermath of Hurricane Katrina, and then upon submission of the necessary paperwork, the Government would reimburse actual costs. 134 Fed. Cl. 730, 732–33 (2017). When the Parish sued alleging that the Government breached the agreement by failing to reimburse all the money the Parish believed was due, the Court dismissed the claim. Again, among other reasons, the Court held that there was no consideration. The Parish had argued that "the benefit flowing to the Government was the restoration of a natural resource and a reduction in the amount of emergency funds that the Government would spend in future flooding emergencies," but the Court held that "this is not the kind of direct benefit . . . that would support the finding of an exchange between the Parish and the Government." *Id*. at 735–36. The Court distinguished between a "generalized" or "incidental" benefit—*e.g.*, a cleared waterway that would reduce the damage from future flooding—and a "direct" benefit to the Government sufficient to support

contract formation. *Id*. at 736. "While debris removal is a worthy project," the Court concluded, "it cannot be construed as providing consideration (i.e.: a direct benefit) to the government in this context." *Id*.

Again, the Court's analysis in *St. Bernard Parish* is on all fours with the situation here: testing of uninsured individuals for COVID-19 was undisputedly a worthy project and the uninsured program likely helped uninsured individuals receive such testing, but HRSA received no *direct* benefit therefrom as necessary to support contract formation.

#### 3. Crestview Fails To Plausibly Allege That Anyone With Actual Authority Bound HRSA To Pay Crestview's Claims

It is black-letter law that the formation of a contract with the Government requires "that the officer whose conduct is relied upon had actual authority to bind the government in contract" to the promise alleged to have been breached. *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989). "[A]pparent authority will not suffice to hold the government bound by the acts of its agents." *Id*.; *see El Centro*, 922 F.2d at 820 ("The United States Government employs over 3 million civilian employees. Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States."). The law further places the burden of establishing actual authority—and the risk of the Government agent failing to have the requisite authority—squarely on the party looking to contract with the Government. *Hanlin*, 316 F.3d at 1328; *El Centro*, 922 F.2d at 820.

Crestview does not identify *anyone* at HRSA that it contends had actual authority to bind the Government to pay the claims it seeks to recover now. Instead, Crestview relies on a bare conclusory allegation that the "contract was authorized by representatives of the Agency who had actual authority to bind the United States," Compl. ¶ 59, but that is paradigmatically

insufficient.[7] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original, citation omitted).

Crestview's conclusory allegation is particularly implausible in this case, where the program indisputably contained an adjudication and approval process for submitted claims. Indeed, Crestview concedes that it was the "[a]djudication and approval of Crestview's COVID-19 UIP testing services, including determination of the quantifiable amount due to Crestview," that "constituted HRSA's agreement and legal liability to pay." Compl. ¶ 17. But this concession undermines Crestview's own demand because HRSA never adjudicated or approved at least $61 million of the claims Crestview seeks to recover—and Crestview pleads no facts to plausibly suggest otherwise. Nor does Crestview plausibly plead that anyone with actual authority to do so, committed HRSA to paying the claims reversed or stopped once they were placed on hold while Crestview's assessment was pending.

4. Crestview Fails To Plausibly Allege That HRSA Intended To Be Contractually Bound To Pay Crestview's Claims

The "threshold condition for contract formation" is "objective manifestation of voluntary, mutual assent." *Turping v. United States*, 913 F.3d 1060, 1065 (Fed. Cir. 2019) (quoting *Anderson*, 344 F.3d at 1353). "To satisfy its burden to prove such a mutuality of intent, a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance." *Id*. As discussed above, Crestview has failed to plausibly allege either offer or

[7] Crestview entirely fails to plead this element, even in a naked conclusory fashion, in Count I alleging the existence of an express contract. At most, Crestview alleges that UnitedHealth "accepted" its claims. Compl. ¶ 50. UnitedHealth did not have authority to bind the Government in contract. Nor could UnitedHealth's "acceptance" of claims constitute the obligation of funds to pay those claims—only HRSA could obligate funds. A35.

acceptance sufficient to form a contract obligating HRSA to pay its claims. But at bottom, mutual assent requires a voluntary and knowing undertaking of obligations—and Crestview's complaint fails to plausibly allege that HRSA made a voluntary and knowing undertaking obligating the Government to pay Crestview's claims.

The gravamen of Crestview's complaint and allegations here is that when the Federal Government called upon the nation to come together in the face of the novel COVID-19 emergency, including for healthcare providers to "step up their coronavirus testing efforts to increase capacity and ensure that every American would have access to testing," Crestview took up that call, "made substantial monetary investments to purchase high-throughput PCR testing systems," and stood on the front lines "to help stop the spread of this deadly virus." Compl. ¶¶ 1–5. But those allegations—even if accepted as true—do not reflect an undertaking by the Federal Government to pay the costs of that testing.

First, it is well-established that there can be no implied-in-*law* contracts with the United States. "We have repeatedly held that [this Court's] jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules Inc. v. United States*, 516 U.S. 417, 423 (1996) (collecting cases); *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1316–17 & n.9 (Fed. Cir. 2011) (same). Thus, Crestview's investments, expenditures, or the mere fact that Crestview performed testing for uninsured individuals cannot, by itself, create a contract—even if the Federal Government could be said to have received a benefit from Crestview's efforts, *but see* Section III.A.2, above. "[T]he mere receipt of such services, even to the benefit of the Government, would not create an implied-in-fact contract to pay for them." *Trauma Serv.*, 104 F.3d at 1327; *City of Cincinnati v. United States*, 153 F.3d 1375, 1378 (Fed. Cir. 1998) ("The fact that the United States may benefit from the . . . services

provided by the city does not create an implied-in-fact contract to pay for those services.”).

Second, the fact that the Federal Government sought to encourage more testing for all Americans, including the uninsured, is also legally insufficient to demonstrate an intent to contractually commit to paying for such testing. “[H]opeful encouragement sounding only in prophecy” does “not import a legally binding promise” and is not “an actionable contract.” *Hall v. First Nat’l Bank*, 173 Mass. 16, 19 (1899) (Holmes, J.).

Finally, HRSA’s statements about the process for claim submission, generally expected timing for reimbursement, or the applicable rates at which claims would be reimbursed are also legally insufficient to create an *obligation* to reimburse any given claim. *See* Compl. ¶ 49. “The obligation of the government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention. Likewise statements of information or definition are not statements of obligation.” *Chattler v. United States*, 632 F.3d 1324, 1330 (Fed. Cir. 2011) (cleaned up, citation omitted).

Thus, for example, in *Cutler-Hammer, Inc. v. United States*, the Treasury Department promulgated regulations inviting applications for the purchase of silver, under certain specified conditions, and specified a minimum purchase price. 441 F.2d 1179, 1180 (Ct. Cl. 1971). Cutler-Hammer had filed the requisite applications and had received acknowledgements of its applications, but had not received any notification that the applications had been approved nor actual payment. *Id*. at 1182. When Cutler-Hammer sued, the Court of Claims held that no contract was formed. The Court concluded both that “nowhere is there a *promise* on the part of the Government to sell even one ounce of silver at the price mentioned” and that “[i]t requires a distortion of plain English to infer that making an application in conformity with the terms of this Regulation would constitute an acceptance of an offer whereby the United States intended to

bind itself." *Id*. at 1182–83 (emphasis in original). The same logic foils Crestview's claims here: HRSA's invitation for healthcare providers to submit claims for reimbursement, subject to express adjudication, approval, and funding conditions, cannot support an undertaking to pay any such submitted claim. There can be no doubt—and Crestview concedes—that the payment of any claim for reimbursement required approval by HRSA. *See* Compl. ¶ 17. "Providing that the application be subject to such approval is alone sufficient to negate existence of a contract until the approval is granted." *Cutler-Hammer*, 441 F.2d at 1182.

5. The Terms And Conditions Do Not Obligate HRSA To Pay Crestview's Claims

Finally, Crestview alleges that the terms and conditions to which it attested formed an express contract with HRSA, and pursuant to this "contract," "HRSA agreed to reimburse Crestview generally at 100 percent of Medicare rates . . . for the COVID-19 testing services provided to uninsured individuals." Compl. ¶¶ 23, 47. Crestview further alleges that HRSA breached this "contract" "by imposing a pause on the Claims payments due to Crestview while it intentionally delayed the Assessment process for over two years and by failing and refusing to pay Crestview at least $69 million due and owing to it for testing services rendered to the COVID-19 UIP." Compl. ¶ 52. But to state a claim for breach of contract, Crestview "must allege facts showing both the formation of an express contract and its breach," and "[w]ithout a breach, this court need not reach the question of whether the[re] is a valid contract." *Trauma Serv.*, 104 F.3d at 1325–26. Thus, even if the terms and conditions constituted an express contract, Crestview fails to plausibly allege that HRSA *breached* the terms and conditions by either conducting its assessment or not paying Crestview's claims.

First, as a simple matter of timing, Crestview attested to the terms in conditions *before* it even *submitted* a claim. Attestation to the terms and conditions happens at step two—before

Crestview even receives the temporary patient IDs that it needs in order to submit a claim, and well before any adjudication, approval, or payment. *See* A51–52. Hence, the terms reference that "[t]he Recipient plans to submit claims for reimbursement . . . ." A86. If Crestview did not, after attestation, actually complete submission—as is the case, for example, for $5 million that it is nevertheless seeking to recover in this litigation—there would be nothing HRSA could even theoretically pay, much less be obligated to pay.

Second, the terms and conditions are addressed to the "Recipient," which they expressly define as "the healthcare provider, whether an individual or an entity, receiving the Payment," *i.e.* "funds received from . . . the Uninsured Program Fund." A87–88. Thus, the terms and conditions address Crestview's obligations if it wants to receive funds, but do not obligate HRSA to disburse funds. To be sure, the terms and conditions also identify the applicable rate of reimbursement: "The Secretary will reimburse the Recipient generally at 100 percent of Medicare rates," unless there is no Medicare rate, in which case a "calculated average rate will be used," or other "[e]xclusions from coverage and alternatives to where Medicare rates do not apply" will govern as "outlined in the program details." A89. But those provisions do not guarantee reimbursement on any given claim—they define the possible scope of the reimbursement if one is paid.

Finally, because Crestview in fact received money from the uninsured program, it was undisputably bound by the terms and conditions with respect to those claims. And the terms and conditions expressly required recipients of funds to "submit reports as the Secretary determines are needed to ensure compliance with conditions that are imposed on this Payment," "maintain appropriate records and documentation," "promptly submit copies of such records and documentation upon [] request," "fully cooperate in all audits the Secretary, Inspector General,

or Pandemic Response Accountability Committee conducts," and warned "that failure to provide requested documentation may result in payment being denied and/or termination from the program." A88–89. Thus, for the $100 million in payments Crestview received, there is no question that HRSA was authorized and entitled to audit those claims. And per HRSA's standard operating procedures, it paused processing Crestview's pending claims while it conducted that review. *See* A100–03; A105. Crestview pleads no facts that would suggest—much less plausibly suggest—that HRSA intentionally delayed the conduct of that audit.

B. Crestview Fails To State A Claim For Breach Of Good Faith And Fair Dealing

Count III of Crestview's complaint alleges a breach of the implied covenant of good faith and fair dealing. But a claim for the breach of the duty of good faith and fair dealing requires, in the first instance, the existence of a contract. "Absent a contract, [a] claim of breach of an implied duty of good faith and fair dealing is unsustainable." *Milton v. United States*, 806 F. App'x 996, 1000 (Fed. Cir. 2020). Thus, if the Court agrees with our arguments in Section III.A, above, that Crestview did not have a contract with HRSA for the payment of its claims, Count III of Crestview's complaint must fail by necessary extension.

Moreover, even in the presence of a contract, "[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010); *see Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (same). "[T]he duty must be keyed to the obligations and opportunities established in the contract, so as to not fundamentally alter the parties' intended allocation of burdens and benefits associated with the contract." *Dobyns*, 915 F.3d at 739 (quotation omitted). Thus, for the reasons stated throughout this motion, Crestview did not, and could not have had, a "reasonable expectation" of receiving reimbursement on any given claim, and the duty of good

faith and fair dealing cannot impose upon HRSA an obligation to pay.

Moreover, Crestview's specific allegations of breach seek to "fundamentally alter the parties' intended allocation of burdens and benefits," or worse—demand that HRSA contravene Congress's constitutional power of the purse. *Id*. Crestview faults HRSA for how it conducted the assessment and for HRSA's "reliance" on the Fiscal Responsibility Act. Compl. ¶ 72. But as explained above, *see* Section III.A.5, HRSA had the right to conduct an assessment of Crestview, and it followed its standard operating procedures for placing providers on hold in doing so. Crestview pleads no facts that would plausibly suggest that HRSA did anything other than what the program terms envisioned. And, as discussed more fully in Section IV, below, none of the $69 million Crestview seeks here was "obligated" in June 2023, when the Fiscal Responsibility Act took effect. Far from being a breach of the duty of good faith and fair dealing, HRSA's compliance with Congress's rescission of funds was constitutionally mandated: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, Sec. 9, Cl. 7.

IV. <u>Congress's Rescission Of Funding Extinguished Crestview's Claims</u>

Even if the Court were to conclude that Crestview had some right to compensation when the claims were submitted, the passage of the Fiscal Responsibility Act rescinding the available funding would foreclose Crestview's claims now. As the Federal Circuit has recognized "in some instances the statute creating the right to compensation (or authorizing the government to contract) may restrict the government's liability or limit its contractual authority to the amount appropriated by Congress." *Greenlee Cty. v. United States*, 487 F.3d 871, 878 (Fed. Cir. 2007). That is, assuming Crestview had any right to compensation, the question is whether Crestview had "an unqualified right to compensation" or "the government's liability [was limited] to the amount appropriated." *Id*. at 877–78.

In this case, Congress granted discretionary lump sum appropriations. Congress did not create a permanent appropriation, but rather gave specific amounts and no more absent additional congressional action. And there can be no doubt that HRSA repeatedly and consistently made explicit that any reimbursement through the uninsured program was limited to the availability of funding. *See e.g.*, A3 (UIP FAQs) ("Q. Who is eligible for funding? A. Health care entities … can request claims reimbursement through the program electronically and are reimbursed generally at Medicare rates, *subject to available funding*."); A31–62 (HRSA Webinar) ("Reimbursement applies to eligible claims, as determined by HRSA (subject to adjustment as may be necessary) . . . *subject to available funding*."); A98–99 (Attestation) ("I further understand that *reimbursement is subject to available funding* for the program."); *see also* https://web.archive.org/web/20220812224124/https://www.hrsa.gov/provider-relief/about/covid-uninsured-claim ("Confirmation of receipt of your claim submission *does not mean the claim will be paid*. … Submitted claims will be paid *subject to the availability of funds*.") (emphasis added to all).

The Federal Circuit, and its predecessor Court of Claims, has held that "language 'subject to the availability of appropriations'"—and functionally analogous terms—"restrict[s] the government's liability to the amounts appropriated by Congress for the purpose" and observed that "even in the contract context [it] means that the government is not contractually bound except to the extent that appropriations are available." *Greenlee Cty.*, 487 F.3d at 878; *Texas v. United States*, 537 F.2d 466, 470 (Ct. Cl. 1976) ("OEP, having provided plaintiff with all of the funds authorized by the President for Federal assistance to the State, it has completely fulfilled its obligation to provide Federal assistance under the terms of the parties' Agreement, and plaintiff cannot recover additional disaster assistance funds from defendant by way of a breach of

contract action.”).

Thus, HRSA’s liability to Crestview, if any, was limited by the availability of funding—and no funding allocated to the uninsured program remains available. On June 3, 2023, Congress passed the Fiscal Responsibility Act, “permanently rescind[ing]” the “unobligated balances” of all the appropriations that were allocated to the uninsured program. 137 Stat. 23–24; *see* https://www.hrsa.gov/provider-relief/about/covid-uninsured-claim (“Program Update: With the passage of the Fiscal Responsibility Act of 2023 and related rescission of program funds, … no additional claims payments will be made under the Uninsured Program.”). Thus, as of June 2023, funding is no longer available in the uninsured program for Crestview’s claims, and HRSA cannot be liable for them.

Crestview does not plead that funding *is* available. Rather, Crestview insists in its complaint that the Fiscal Responsibility Act “has no bearing on the adjudicated payments due and owing to Crestview which are obligated, not unobligated, funds.” Compl. ¶ 18. That allegation is self-defeating, and, if anything, implicitly concedes that Crestview’s complaint is foreclosed by Congress’s recission.

The bulk of Crestview’s claims were *not* and never have been “adjudicated” much less “obligated” and Crestview pleads no facts that would plausibly suggest that they were. Indeed, the only substantiating fact that Crestview pleads is that “UnitedHealth issued temporary patient IDs for Crestview’s billed claims.” Compl. ¶ 28. But obtaining a temporary patient ID is the step *before* a claim is *submitted*. *See* A45. And *UnitedHealth* could not approve a claim—“[a]ll program funding, coverage, and reimbursement policies [were] set forth by HRSA.” A35. That is, even if we accept as true that Crestview had temporary patient IDs for all the patients associated with all the claims it seeks recovery for now, that alone would not be enough to

plausibly suggest that Crestview even *submitted* those claims for adjudication, much less that any such claim was actually adjudicated and approved. And indeed, Crestview's complaint in California acknowledged that $5 million of the claims for which it seeks reimbursement were not submitted. *See* ECF 1 at ¶ 26, Case No. 8:23-cv-01913 (C.D. Cal.).

And with respect to the ~$7 million that were at one point adjudicated, approximately $3.6 million were never obligated because payment was stopped and there is no question that HRSA deobligated the remaining $3.4 million when it placed Crestview under a hold pending the outcome of its assessment. *See* Compl. ¶¶ 30–31 ("reversing and recouping over $3.4 million paid to Crestview" and "payments were never received by Crestview"); *see also* "Deobligation," GAO Glossary at p. 44 ("An agency's cancellation or downward adjustment of previously incurred obligations."). HRSA never reobligated those funds before June 3, 2023—the operative date when the "rescission made by this title shall be applied to the unobligated balances for each applicable appropriation" under the Fiscal Responsibility Act, 137 Stat. 23—and Crestview pleads no facts that could plausibly suggest otherwise.

Thus, the Fiscal Responsibility Act extinguished any further liability to Crestview.

## CONCLUSION

For the foregoing reasons, Crestview's complaint should be dismissed.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

s/ Corinne A. Niosi
CORINNE A. NIOSI
Assistant Director

s/ Galina I. Fomenkova
GALINA I. FOMENKOVA
Senior Trial Counsel
United States Department of Justice
Civil Division, Commercial Litigation Branch
P.O. Box 480 | Ben Franklin Station
Washington, DC 20044
(202) 514-5495
galina.fomenkova@usdoj.gov

*Attorneys for the United States*

OF COUNSEL

TAMARA CLARK
SUZANNE YURK
National Complex Litigation and
Investigations Division
Office of the General Counsel
U.S. Dept. of Health & Human Services

October 25, 2024