**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CRESTVIEW CLINICAL LABORATORY, LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 24-995 C<br><br>(Judge Robin M. Meriweather) |

**PLAINTIFF CRESTVIEW CLINICAL LABORATORY, LLC'S OPPOSITION TO DEFENDANT THE UNITED STATES OF AMERICA'S MOTION TO DISMISS FOR LACK OF JURISDICTION**

## TABLE OF CONTENTS

**Page**

I. STATEMENT OF QUESTIONS INVOLVED ........................................ 1

II. SUMMARY OF FACTS ........................................ 2

III. ARGUMENT ........................................ 7

A. Standard of review ........................................ 7

1. Motion to Dismiss – RCFC 12(b)(1) ........................................ 8

2. Motion to Dismiss – RCFC 12(b)(6) ........................................ 9

B. The Government Improperly Asks the Court to Review Materials Outside the Complaint at the Pleading Stage ........................................ 10

C. Crestview has Pled the Essential Elements of its Breach of Contract Claim and Any Inquiry Beyond the Pleadings is a Factual Issue that Cannot be Resolved Before Discovery ........................................ 11

1. Crestview has adequately pled mutuality of intent to contract and offer and acceptance ........................................ 12

2. Crestview has adequately pled consideration as the Government received a direct benefit by avoiding necessary expenditures needed to sustain promised COVID-19 testing for an entire nation ........................................ 17

3. Plaintiff has sufficiently alleged authority to contract ........................................ 22

D. Crestview has Plausibly Pled a Money-Mandating Statute in Support of Count IV as Statutes Can Become Money-Mandating where the Government Adopts Guidelines or Documents Creating a Mandate ........................................ 26

E. The Government's Position on the Obligated Payments Due to Crestview is not Relevant to this Motion and, in any event, is Without Merit ........................................ 29

IV. CONCLUSION ........................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Algonac Manufacturing Company v. United States*
192 Ct. Cl. 649 (1970) ....................20, 21

*Arbitraje Casa de Cambio, S.A. de CV. v. United States*
79 Fed. Cl. 235 (2007) ....................22

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)....................9, 10

*Balt. & Ohio R.R. v. U.S.*
261 U.S. 592 (1923)....................12

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007)....................9

*Biltmore Forest Broad. FM, Inc. v. United States*
555 F.3d 1375 (2009)....................11

*Brandt v. Hickel*
427 F.2d 53 (1970)....................5

*Carter v. United States*
102 Fed. Cl. 61 (2011) ....................17

*City of El Centro v. U.S.*
922 F.2d 816 (1990)....................18, 19, 25, 26

*Engage Learning, Inc. v. Salazar*
660 F.3d 1346 (2011)....................8, 11

*Erickson v. Pardus*
551 U.S. 89 (2007)....................9

*Estate of Bogley v. United States*
514 F.2d 1027 (1975)....................17

*Fisher v. United States*
128 Fed. Cl. 780 (2016) ....................11

*H. Landau & Co. v. United States*
886 F.2d 322 (Fed. Cir. 1989)....................25, 26

*Hanlin v. United States*
214 F.3d 1319 (2000)....8, 11, 12, 22

*Henke v. United States*
60 F.3d 795 (1995)....7

*Holmes v. United States*
657 F.3d 1303 (2011)....8

*Hometown Fin., Inc. v. United States*
409 F.3d 1360 (2005)....11, 12, 13

*King v. United States*
159 Fed. Cl. 450 (2022)....12

*Laudes Corp. v. United States*
86 Fed. Cl. 152 (2009)....25

*Leonardo v. United States*
60 Fed. Cl. 126 (2004)....22

*Lewis v. United States*
70 F.3d 597 (1995)....8

*Lippmann v. United States*
127 Fed. Cl. 238 (2016)....10, 11

*Local Initiative Health Authority for L.A. County v. United States*
142 Fed. Cl.1 (2019)....30

*Mendez v. United States*
121 Fed. Cl. 370 (2015)....11

*Monzo v. United States*
2013 WL 6235608 (Fed. Cl., Nov. 27, 2013, No. 12-724C)....26, 27

*Morse Diesel International, Inc. v. United States*
66 Fed. Cl. 788 (2005)....7

*OAO Corp. v. United States*
17 Cl. Ct. 91 (1989)....14

*Peninsula Grp. Cap. Corp. v. United States*
93 Fed. Cl. 720 (2010)....12

*Price v. Panetta*
674 F.3d 1335 (Fed. Cir. 2012)....27

*Rivera v. Centro Medico de Turabo, Inc.*
575 F.3d 10 (2009)....................11

*Roberts v. United States*
745 F.3d 1158 – 67 (2014)....................26

*Rudder v. Williams*
666 F.3d 790 (2012)....................9

*Silverman v. United States*
230 Ct. Cl. 701, 679 F.2d 865 (1982)....................14

*Simms v. District of Columbia*
699 F. Supp. 2d 217 (2010)....................9

*Sin Hang Lee v. United States*
142 Fed. Cl. 722 (2019)....................15, 16

*Skinner v. Switzer*
562 U.S. 521 (2011)....................7

*Sommers Oil Co. v. United States*
241 F.3d 1375 (2001)....................9, 22, 23, 24

*Spruill v. Merit Sys. Protection Bd.*
978 F.2d 679 (1992)....................8

*St. Bernard Parish Gov't v. United States*
134 Fed. Cl 730 (2017)....................19

*Thermalon Indus., Ltd. v. United States*
34 Fed. Cl. 411 (1995)....................17

*Thomson v. United States*
174 Ct. Cl. 780 (1966)....................14

*Trauma Serv. Grp. v. United States*
104 F.3d 1321 (1997)....................8

*TrinCo Inv. Co. v. United States*
722 F.3d 1375 (2013)....................9

*U.S. Home Corp. v. United States*
92 Fed. Cl. 401 (2010)....................8, 9

*U.S. v. Mitchell*
463 U.S. 206 (1983)....................8

*Woll v. United States*
45 Fed. Cl. 475 (1999) ....................................................................................................17

**FEDERAL STATUTES, REGULATIONS, AND RULES**

28 U.S.C.
§ 1491(a)(1) ....................................................................................................................8

31 U.S.C.
§ 1501(a) .......................................................................................................................30

USC Fed. Claims
Rule 12 ..............................................................................................................................1
Rule 12(b)(1).....................................................................................................................8

**STATE STATUTES, REGULATIONS, AND RULES**

Government's Motion, p.3, fn 1, OIG Report No. A-02-21-01013 (July 2023), p. 3, fn 10, available at https://oig.hhs.gov/documents/audit/6536/A-02-21-01013-Complete%20Report.pdf
..................................................................................................................4, 18, 19

**OTHER AUTHORITIES**

1 Williston, Contracts § 102 (1957).....................................................................................17

Bryan A. Garner, A Dictionary of Modern Legal Usage 941-942 (2d ed., Oxford U. Press 1995)
..........................................................................................................................................28

https://coviduninsuredclaim-stage.linkhealth.com/] ..........................................................5

https://oig.hhs.gov/documents/audit/6536/A-02-21-01013-Complete%20Report.pdf.................23

Restatement (Second) of Contracts
§ 1 (1981).........................................................................................................................12
§ 71....................................................................................................................................17
§ 72 (1981).......................................................................................................................17

Plaintiff, Crestview Clinical Laboratory, LLC ("Crestview" or "Plaintiff"), pursuant to Rule 12 of the United States Court of Federal Claims, by and through its undersigned counsel, files this response in opposition to Defendant the United States of America's (the "Government" or "Defendant") Motion to Dismiss Plaintiff's Complaint for lack of jurisdiction and failure to state a claim upon which relief can be granted ("Motion"). Plaintiff requests this Court deny Defendant's Motion in its entirety. In support of its response in opposition to Defendant's Motion, Plaintiff relies upon the pleadings, the record and the following brief.

## I. STATEMENT OF QUESTIONS INVOLVED

1. Whether Plaintiff's Complaint sufficiently alleges that the Government breached an express or implied-in-fact contract where Crestview stepped up and answered the Government's call in a time of unprecedented crisis to test for COVID-19 among the Nation's most vulnerable populations and relied upon the multiple express representations by the Government that it "will" reimburse providers for claims meeting the requirements under the terms and conditions of the payment program?
2. Whether the Government's adoption of multiple terms and conditions and guidelines intended to implement the COVID-19 Uninsured Program effectively surrendered any potential discretionary authority under the statutes that funded the Uninsured Program and thereby created a regulatory framework that required payment to providers that conducted tests under the Uninsured Program and submitted qualifying claims?

## II. SUMMARY OF FACTS

This case arises from the Government's unjust and legally unsupported refusal to reimburse Crestview for emergency testing services rendered and furnished to America's most impoverished and vulnerable populations during the height of the COVID-19 pandemic (also referred to herein as the "Pandemic") for properly submitted and obligated claims as part of the COVID-19 Uninsured Program ("UIP").

Starting in March 2020, Congress enacted several emergency assistance programs intended to address the onset of the COVID-19 pandemic, including an effort to expand access to COVID-19 testing for all individuals, regardless of insurance status or ability to pay. The goal to solicit, induce and engage clinical laboratories to furnish emergency COVID-19 testing services was part of the broader public health response to control the spread of the COVID-19 virus and ensure equitable access to resources to the benefit of all persons within the United States, including undocumented immigrants and international visitors. The programs enacted by the Government that funded the UIP included the Coronavirus Aid, Relief, and Economic Security Act ("CARES" Act), the Families First Coronavirus Response Act ("FFCRA"), the Paycheck Protection Program and Health Care Enhancement Act ("PPPHCEA"), and the American Rescue Plan Act of 2021 ("ARPA"), (collectively, the "UIP Funding Laws"). The UIP Funding laws contained provisions meant to induce private sector providers to furnish COVID-19 testing services to uninsured individuals to ensure that financial barriers did not prevent access to testing and identification of active spread – recognized to be an untenable line of business for the private sector without the support and guarantees by the Government to receive payment for the work.

In late 2020, President Trump, during his daily COVID-19 briefing, called on all diagnostic laboratories (like Crestview) to increase their testing capacity to help our nation

quickly isolate individuals who tested positive in an effort to contain the virus while a vaccine was still under development. Crestview answered that call and made significant investments in testing infrastructure and human resources. At the height of the Pandemic, Crestview purchased sixteen (16) High-throughput PCR machines (that significantly increased testing capacity) and employed numerous employees and contractors. As a result, Crestview tested and reported more than 1.5 million COVID-19 PCR tests during the Pandemic. Additionally, Crestview served as a member of the California COVID-19 Testing Task Force during the Pandemic. (Plaintiff's Complaint, ¶¶ 5 and 12).

In its Motion, the Government mischaracterizes the United States Department of Health & Human Services ("HHS"), Health Resources and Services Administration ("HRSA") UIP as "an assistance fund, not a payment guarantee" and that it did not "create entitlements for, or commercial arrangements with, Crestview." (Motion, p. 7). The Government also erroneously asserts that HRSA was not "purchasing services from Crestview for its own benefit - nor, critically was it undertaking or promising to reimburse any given claim." (*Id.*). The Government further suggests that Crestview's receipt of payments for separate and unrelated UIP testing should be sufficient to satisfy Crestview's pleas for reimbursement of unpaid claims (which it has requested for well over two years), notwithstanding the fact that Crestview endured extreme financial hardship as a result of the Government's intentional failure to pay Crestview over $69 million in obligated funds for submitted claims.

The Government's statements are not only incorrect, but they also do not support the Motion to Dismiss. In fact, most of the Government's statements, including those related to the UIP, COVID relief funding, HRSA's alleged Assessment process, and HRSA's payment of other Crestview UIP claims not at issue in the instant matter, are *not relevant* to its Motion. Contrary

to the Government's arguments, the Complaint sufficiently alleges grounds for relief, namely, the Government has failed to honor its statutory and contractual obligations to pay Crestview for the critical testing services it rendered during the Pandemic. Crestview has sufficiently pled that the Government created legal obligations to pay Crestview for COVID-19 testing services that were rendered and processed well prior to the shut-down of the HRSA payment portal in March 2022. Moreover, as the HHS, Office of Inspector General ("OIG") noted, claims submitted before the program submission deadlines were continuing to be adjudicated *and paid* after HRSA was no longer accepting UIP claims.[1] The vast majority of Crestview's claims at issue in the instant matter were submitted months before the program submission deadline. (Plaintiff's Complaint, ¶¶ 29 – 31). Further, the Government's passing of the Fiscal Responsibility Act ("FRA") on June 3, 2023, rescinding COVID-19 remaining *unobligated* funds, is not relevant when the amounts due and owing to Crestview are obligated, have not been repealed and can and should be paid, if necessary, from the Judgment Fund.

From the start of the Pandemic, HHS was responsible for UIP oversight and policy decisions. As part of its oversight, HHS delegated administration of the UIP to HRSA. HRSA, in turn, represented to providers that "Your Role is Critical. Ensure You Are Reimbursed" and promised that the UIP "*will provide* claims reimbursement for eligible COVID-19 testing or treatment of uninsured individuals with COVID-19 on or after February 4, 2020, and COVID-19 vaccination administration fees." (Emphasis added; Plaintiff's Complaint, ¶ 27). HRSA further expressly stated:

> As part of enacted legislation, the Families First Coronavirus Response Act, the Paycheck Protection Program and Health Care Enhancement Act, and the Coronavirus Response Aid, Relief, and Economic Security (CARES) Act, and the Coronavirus Response

[1] See Government's Motion, p.3, fn 1, OIG Report No. A-02-21-01013 (July 2023), p. 3, fn 10, available at https://oig.hhs.gov/documents/audit/6536/A-02-21-01013-Complete%20Report.pdf

> and Relief Supplemental Appropriations Act (CRRSA), - the Department of Health and Human Services (HHS) will provide claims reimbursement to health care providers generally at the Medicare rates for testing uninsured individuals for COVID-19, for treating uninsured individuals with a COVID-19 primary diagnosis, and for COVID-19 vaccine administration to the uninsured. Physicians and other health care providers are true heroes – especially during the COVID-19 pandemic – and HHS is grateful for their continued dedication.
>
> [https://coviduninsuredclaim-stage.linkhealth.com/]

Instead of honoring its representations to providers, the Government abandoned its heroes that answered the desperate call of the Government to serve this country in one of its greatest times of need in a generation. The Government, without any support and quite unjustly, suggests that dedicated providers like Crestview have been sufficiently paid for *past testing services* as grounds to not pay them the amounts it clearly still owes them.[2]

To the contrary, Crestview depended on "trust in the government as a fair partner" when it contracted to furnish expedited COVID-19 testing services to the UIP. The Government's position "that it can renege" on its solicitations, representations, and contractual commitments and "to say to [Crestview], 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government." *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970). The Government's failures to live up to its contractual commitments cannot and should not be condoned by this Court. Additionally, as detailed below, Plaintiff has met its pleading obligations, and the Court should deny the Motion in its entirety.

As part of the UIP Funding Laws, the Government established the UIP, administered by

[2] Moreover, the Government's Motion improperly and *falsely states* that Crestview owes it a large refund for previously paid claims. Notwithstanding the fact that this is irrelevant to the pending proceedings and Motion, it is also based on legally unsupported extrapolations of minor errors identified in the HRSA Assessment findings. This is clearly an unscrupulous effort by the Government to paint an unfair and negative picture of Plaintiff.

the HRSA, to conduct COVID-19 tests for uninsured individuals at no cost to the patient. The UIP Funding Laws express commitment was to reimburse eligible health care providers for health care related services. Specifically, the UIP Funding Laws directed the Government to expeditiously make payments to providers for claims related to health care services, including COVID-19 testing. (Plaintiff's Complaint, ¶¶ 7-11.) The Government effectively represented to the public, including the providers who stepped up to furnish testing services, it "shall pay" providers by repeatedly referencing that it "will pay" or "will reimburse" qualifying claims throughout multiple terms and conditions set out for the UIP. The term "will" is interchangeable with the word "shall," both demonstrating a legal obligation.

The UIP Terms and Conditions identified mutual obligations of the Government and providers. While the Government required providers to make several representations in order to participate in the program, including that their claims "will" be full and complete, similarly, the Government represented that *"[t]he Secretary will reimburse* the [provider] generally at 100 percent of Medicare rates (including any amounts that would have been due to the provider as patient cost sharing) for the items and services that [the provider] provided to Uninsured Individuals for which the [provider] submits claims to the Uninsured Program Fund unless otherwise noted." (Emphasis added.; Motion Appendix, Docket No. 12-1, p. A89; *see also* Plaintiff's Complaint, ¶ 47.) The Government's obligation to reimburse providers was also emphasized in numerous documents that are part and parcel of their contractual commitment including the FAQs which identify the Government's acknowledgment that it would pay providers by stating "[t]his program provides reimbursements on a rolling basis directly to eligible providers for claims attributed to the testing, treatment, or vaccine administration for COVID-19 for uninsured individuals." (Motion Appendix, p. A2, General Questions, *FAQs for*

*COVID-10 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration*. HRSA also presented a webcast entitled "Getting Started with the HRSA COVID-19 Uninsured Program," emphasizing that "[t]he program will provide claims reimbursement." (Motion Appendix, p. A33). As discussed in detail below, these statements and affirmative representations by the Government promising payments to providers submitting qualifying claims collectively establish the Government's contractual obligation to make payments under the UIP, including to Crestview. Plaintiff, as such, has sufficiently pled non-frivolous allegations of an express or implied-in-fact contract and the Government's Motion must be denied.

## III. ARGUMENT

### A. Standard of review

When determining a motion to dismiss, the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Morse Diesel International, Inc. v. United States*, 66 Fed. Cl. 788, 797 (2005) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). The allegations in the pleading must contain a short, plain statement showing a plausible entitlement to relief. *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011). The question for the Court at this juncture is not whether Crestview will ultimately prevail, but whether there are sufficient allegations to cross this Court's threshold. *Id.* Here, the Government has challenged Plaintiff's standing to bring its claim as well as this Court's jurisdiction to decide the claim. In the instant case, the Government's Motion must be denied because Crestview has established jurisdiction for this Court, its standing to appear before this Court, and its right to recover damages under the stated claims as described in detail below.

**1. Motion to Dismiss – RCFC 12(b)(1)**

The Tucker Act grants the Court of Federal Claims broad jurisdiction over "express or implied contract(s) with the United States." 28 U.S.C. § 1491(a)(1). If a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit. *U.S. v. Mitchell*, 463 U.S. 206, 216, (1983). For purposes of Tucker Act jurisdiction, alleged contracts enjoy a presumption that money damages are available for breach. *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). Additionally, "any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the government." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

To survive a challenge to jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the Federal Circuit has held unambiguously that "jurisdiction ... requires no more than a non-frivolous allegation of a contract with the government." *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (citing, *e.g., Lewis v. United States*, 70 F.3d 597, 602, 604 (Fed. Cir. 1995)); *see also Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed. Cir. 2000) (explaining that a non-frivolous allegation of the existence of an implied-in-fact contract is sufficient to confer jurisdiction unless another statute divests the court of jurisdiction). Thus, a plaintiff merely "must show that either an express or implied-in-fact contract underlies its claim." *Trauma Serv. Grp*., 104 F.3d at 1325 (Fed. Cir. 1997) (stating "[a] well-pleaded allegation [of express or implied-in-fact contract] in the complaint is sufficient to overcome challenges to jurisdiction." (citing *Spruill v. Merit Sys. Protection Bd*., 978 F.2d 679, 686 (Fed. Cir. 1992))); *see also U.S. Home Corp. v. United States*, 92 Fed. Cl. 401, 411 (2010) (explaining that "[a] non-frivolous jurisdictional allegation is one that asserts that the plaintiffs are 'within the class of plaintiffs entitled to recover under the

money-mandating source'" (citing *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008))). Thus, the relevant issue in a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.*

**2. Motion to Dismiss – RCFC 12(b)(6)**

When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint," and "must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). "To avoid dismissal under RCFC 12(b)(6), a party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Further, a cause of action requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2). Plaintiffs are not required to plead "detailed factual allegations" to state claims. *Bell Atl. Corp.*, 550 U.S. at 555; *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (stating "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests.") (citations and alteration omitted). Plaintiffs need only set forth enough facts to state claims that are facially plausible. *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Simms*

*v. District of Columbia*, 699 F. Supp. 2d 217, 222 (D.D.C. 2010) (citation omitted). The standard calls only for “more than a sheer possibility that a defendant has acted unlawfully.” *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

### B. The Government Improperly Asks the Court to Review Materials Outside the Complaint at the Pleading Stage

As an initial matter, the Government’s Motion relies on certain materials attached via an appendix to its Motion which are not properly subject to judicial notice and, thus, cannot be considered in the context of a motion to dismiss. Although the Court may look outside the four corners of the complaint in a motion to dismiss, that is limited to “matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record.” *Lippmann v. United States*, 127 Fed. Cl. 238, 247 (2016) (internal citations omitted).

Here, the Government submits, via an appendix, 137 pages of additional material (“Motion Appendix”) that is outside the four corners of Plaintiff’s Complaint, some of which is not incorporated by reference therein, not integral to Plaintiff’s claim, is not subject to judicial notice and is not a matter of public record. Specifically, Plaintiff objects to the improper reference and argument relating to the following documents attached to the Motion Appendix: (1) a letter from DHHS to Plaintiff’s President and Chief Operating Officer regarding claim reimbursement dated March 18, 2022 (Motion Appendix, pp. A104 – 105), and (2) an “Uninsured Program Assessment Report” (for Crestview’s past paid claims not at issue in the instant matter) dated April 15, 2024 (Motion Appendix, pp. A106 – 137). These documents may not be considered by the Court on a motion to dismiss as they are not incorporated by reference into Plaintiff’s Complaint, not integral to Crestview’s claim, not subject to judicial notice and not matters of public record. *Lippman*, 127 Fed. Cl. At 247. If the Court is inclined to consider the

documents, it is important that formal notice be provided that the Court intends to convert this Motion into one for summary judgment and provide Crestview a reasonable opportunity to present all material pertinent to a motion for summary judgment under RCFC 56. *See* RCFC 12(d); *Id*; *see also Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009).

### C. Crestview has Pled the Essential Elements of its Breach of Contract Claim and Any Inquiry Beyond the Pleadings is a Factual Issue that Cannot be Resolved Before Discovery

Plaintiff's Complaint asserts causes of action for breach of express contract (Count I), alternatively, breach of an implied-in-fact contract (Count II), and breach of the implied covenant of good faith and fair dealing (Count III). The Government's Motion claims Plaintiff fails to plausibly allege *any* of the elements of contract formation to sustain Counts I through III. This is inaccurate and where a plaintiff claims that the Government has breached an express or implied-in-fact contract, it need only make a "non-frivolous *allegation* of a contract with the government," which Plaintiff has clearly done. *Mendez v. United States*, 121 Fed. Cl. 370, 378 (2015) (citing *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011)) (emphasis in original). To sustain its claim, a plaintiff must plausibly plead the elements of a contract with the government: "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government." *Fisher v. United States*, 128 Fed. Cl. 780, 785 (2016) (citing *Biltmore Forest Broad. FM, Inc. v. United States*, 555 F.3d 1375, 1380 (Fed. Cir. 2009) (citation omitted)); *Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1364 (Fed. Cir. 2005); *Hanlin*, 316 F.3d at 1328.

The requirements for showing the existence of a contract[3] with the Government are the same whether the contract is express or implied-in-fact. *Hanlin*, 316 F.3d at 1328. The difference between the two types of contracts is the evidence used to establish those requirements. In an implied-in-fact contract, a "meeting of minds ... 'is inferred, as a fact, from the conduct of the parties'" and the surrounding circumstances. *Id.* (citing *Balt. & Ohio R.R. v. U.S.*, 261 U.S. 592, 597 (1923)).

### 1. Crestview has adequately pled mutuality of intent to contract and offer and acceptance

Crestview has pled ample allegations that the parties had a shared intent to contract and there was indeed an offer and acceptance particularly given the past performance and payments made by the Government to Crestview. Notably, circumstantial and documentary evidence may be used to support an intent to contract by an agency. *See, e.g., Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1364 (Fed. Cir. 2005) ("abundant documentary proof" may establish mutual intent to contract); *Peninsula Grp. Cap. Corp. v. United States*, 93 Fed. Cl. 720, 728 (2010) (mutual intent may be inferred from the conduct of the parties). The Federal Circuit has found that agency correspondence and memoranda may reflect the type of proof necessary to support finding an intent to contract. *Hometown Fin*., 409 F.3d at 1365. Thus, mutuality of intent to contract can be established by the surrounding factual circumstances.

Here, the UIP Funding Laws and the accompanying terms and conditions for each law, including the Terms and Conditions: Families First Coronavirus Response Act ("T&Cs for

[3] A "contract" is defined as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Restatement (Second) of Contracts § 1 (1981) (emphasis added). *King v. United States*, 159 Fed. Cl. 450, 468 (2022).

FFCRA"), Motion Appendix, pp. A63 – A74), the Terms and Conditions: Provider Relief Fund & American Rescue Plan Act (June 1, 2021 – December 17, 2021) ("June 2021 T&Cs for ARPA"), Motion Appendix, pp. A75 – AA85), and the Terms and Conditions: Provider Relief Fund & American Rescue Plan Act (December 17, 2021 – end) ("December 2021 T&Cs for ARPA"), Motion Appendix, pp. A86 – A97[4], each contained an explicit clause stating that the Government "***will reimburse***" Crestview "at 100 percent of Medicare rates" for its eligible UIP testing claims. (T&Cs for FFCRA, Motion Appendix, p. A66; June 2021 T&Cs for ARPA, Motion Appendix, p. A78; December 2021 T&Cs for ARPA, Motion Appendix, p. A89) (Emphasis added).

Additionally, the Director of the HRSA Office of Provider Support's Division of Policy and Program Operations, Susan Marsiglia Gray, gave a webinar presentation titled "HRSA COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration of the Uninsured" accompanied by presentation materials (the "Webinar PowerPoint," Motion Appendix, pp. A30 – A62). Similar to the UIP Terms and Conditions, the Webinar PowerPoint also stated that as "part of enacted [UIP Funding Laws] – the U.S. Department of Health and Human Services (HHS), ***will provide*** claims reimbursement to health care providers for testing uninsured individuals for COVID-19." (Webinar PowerPoint, Motion Appendix, p. A33, emphasis added). Collectively, the UIP Terms and Conditions, further confirmed by the Webinar PowerPoint presentation, are the type of proof (and allegations at the pleadings stage) that support an intent by the Government to contract with participating providers. *See, e.g., Hometown Fin.*, 409 F.3d at 1365.

Specifically, in the UIP Terms and Conditions, the Government promised the UIP

[4] The T&Cs for FFCRA, June 2021 T&Cs for ARPA, and the December 2021 T&Cs for ARPA are collectively hereinafter referred to as the "UIP Terms and Conditions."

participants, including Crestview, that if they met the program eligibility requirements, they would be paid at 100% of Medicare rates for COVID-19 testing services they provided to uninsured individuals for qualifying claims they submitted prior to the March 2022 shut-down of the UIP portal. Indeed, the UIP Terms and Conditions were an unambiguous "offer" by the Government to providers as they set out the terms at which providers could participate and get paid – an offer that Crestview accepted by agreeing to the UIP Terms and Conditions during registration into the program, complying with the UIP Terms and Conditions, performing more than a million tests during the Pandemic, and submitting each compliant test through the UIP portal between the dates of November 20, 2020, through March 22, 2022. (Plaintiff's Complaint, ¶¶ 23 – 24). This was done with the expectation that Crestview would be paid in accordance with the terms laid out in the UIP Terms and Conditions.

Without such promises to pay, Crestview would never have engaged in such risky business, *i.e.*, conduct over a million COVID-19 tests for uninsured individuals, as it undoubtedly would be a money-losing business. While express and implied-in-fact contracts can be held to exist without a contractor's performance of work, generally, performance of work provides strong evidence of the existence of such a contract. Courts generally view contractors as business entities that would not incur costs and perform work without the assurance of compensation. *See Thomson v. United States*, 174 Ct. Cl. 780, 794 (1966). As a result, there is great weight given to the fact that a contractor has taken on costs and performed some or all of the work required under an implied-in-fact contract. *See, e.g., Silverman v. United States*, 230 Ct. Cl. 701, 679 F.2d 865 (1982); *OAO Corp. v. United States*, 17 Cl. Ct. 91 (1989). Plaintiff incurred, and alleged as such in its Complaint, substantial monetary investments to significantly increase its testing capacity and ultimately provided the support required by the Government to

reach its goal of getting communities out of lock down and back into schools and offices. (Plaintiff's Complaint, ¶ 5).

Plaintiff has unambiguously alleged that there was an offer to Crestview, which it accepted by agreeing to the UIP Terms and Conditions *and* submitting compliant claims through the UIP portal as required. Moreover, the fact that Plaintiff took substantial affirmative steps to perform work is compelling evidence that, at a minimum, an implied-in-fact contract with the Government had been reached. It would defy all logic for Plaintiff to commit such resources over the course of more than a year, *whereupon the Government actually paid Crestview for its work under the contract*, if the parties had not had an agreement in place.

The Government attempts to characterize the UIP Terms and Conditions as "mere solicitations, invitations, or instructions" that were not offers, citing for example, *Sin Hang Lee v. United States*, 142 Fed. Cl. 722 (2019). (Motion, pp. 20 – 21). The UIP Terms and Conditions, however, were not mere solicitations, invitations, or instructions. They were detailed offers to qualified providers setting out the terms of an agreement that Crestview chose to accept and rely upon to its great detriment. The Government's reliance on *Hang Lee* is misplaced. *Hang Lee* involved an inventor who allegedly developed a molecular test for the accurate diagnosis of Lyme disease and claimed he entered into an implied-in-fact contract with the United States Centers for Disease Control and Prevention (CDC) to endorse the test and that the CDC breached the contract. *Hang Lee*, 142 Fed. Cl. at 726. Plaintiff alleged that the CDC offered to enter into a contract during a conference on Lyme disease when the Chief of the CDC stated: "So wherever possible we encouraged and required other non-serologic-based tests in addition to clinical presentation so that might have included PCR or culture or both ... And again I'm looking forward to seeing a greater utilization of PCR as a diagnostic tool in the future." *Id.* The court

found the Chief's public statement at a conference suggested no more than a desire, or a general willingness, to see greater utilization of PCR as a diagnostic tool for testing Lyme disease. *Id.* at 731. Unlike the UIP and its detailed terms and conditions, the public statement made in *Hang Lee* that the plaintiff attempted to rely upon as the basis for an agreement did not contain a promise, nor did it make a request of anyone to develop a diagnostic test for Lyme disease. *Id.* As such, the *Hang Lee* court found that plaintiff could not reasonably rely upon the public statement to show that the CDC extended an offer to enter into an implied-in-fact contract.

*Hang Lee* is easily distinguishable from the present matter. Here, the Government did make a promise. It promised to pay 100% of Medicare rates for COVID-19 testing performed for uninsured patients that met the UIP Terms and Conditions. There was no ambiguity as to what Crestview had to do to get paid under the UIP and the Government promised to pay if the conditions were met. Indeed, the Government set up administrators for processing claims, methods for ensuring UIP Terms and Conditions were met, and contracted with third parties to facilitate payments. (Plaintiff's Complaint, ¶¶ 26 – 27). Additionally, as alleged by Crestview in its Complaint, the Government *did make a request* to health care providers to step up and perform the significant work needed to meet its goals to test every person in America, no matter their financial situation. (Plaintiff's Complaint, ¶¶ 2, 3, 5).

The Government's argument that because Crestview attested to the UIP Terms and Conditions *before* it submitted claims and had to submit *eligible* claims meant that no contract could have been formed is completely unavailing and nonsensical. Every contract requires the parties to perform in stages. At the outset, there are usually terms agreed to *before* any performance, once performance occurs, and it is confirmed the performance conforms with the terms of the agreement, then payment can be rendered. This is the path of a contract and

therefore cannot serve as a bar to asserting an express or implied-in-fact contract with the Government pursuant to the UIP Terms and Conditions. Notably, this Court has recognized that terms and conditions set forth by the Government (that prompted action by another party) can serve as the basis for an express or implied contract with the United States. *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 415 (1995) (finding terms and conditions for a grant award issued by the Government could serve as the basis for a contract, which the plaintiff accepted when it commenced work on the grant project). As such, Plaintiff has sufficiently alleged an offer and acceptance of an express or implied contract, and mutuality of intent to contract between the parties.

**2. Crestview has adequately pled consideration as the Government received a direct benefit by avoiding necessary expenditures needed to sustain promised COVID-19 testing for an entire nation**

Crestview has adequately pled consideration as Crestview suffered a detriment (by conducting over a million tests) and the Government received a benefit in that it was able to respond to a national emergency – by ensuring uninsured individuals were receiving vital health care services to prevent the spread of COVID-19 – as the Government was unable to provide such services at such a scale without fortifying the existing healthcare system through the assistance of private companies such as Crestview. "Consideration is defined as a 'detriment incurred by the promisee, or a benefit received by the promisor at the request of the promisor.' " *Woll v. United States*, 45 Fed. Cl. 475, 477 (1999) (quoting *Estate of Bogley v. United States*, 514 F.2d 1027, 1033 (1975) (quoting 1 Williston, Contracts § 102 (1957))); *see also Carter v. United States*, 102 Fed. Cl. 61, 66 (2011) (stating "[c]onsideration is generally a bargained for exchange consisting of an act, forbearance, or return promise") (citing Restatement (Second)

Contracts §§ 71, 72 (1981)).

The Government cites to *City of El Centro v. U.S.*, 922 F.2d 816 (1990) in support of its position that no consideration existed for the contract alleged in the instant matter. *El Centro*, however, is distinguishable. *El Centro* involved aliens injured in a car chase with the Border Patrol. After a fiery accident, the surviving aliens were transported to and treated at a nearby hospital. The question before the court was whether the U.S. was obligated to pay the significant hospital costs for treating the aliens. Ultimately, the court held there was no consideration creating an implied-in-fact contract because the aliens were never in the custody of the U.S. and therefore the U.S. government never assumed any responsibility to care for the injured aliens. *El Centro,* 922 F.2d at 823. Here, the Government very clearly and publicly recognized a national emergency and decided it would assume the responsibility (and take a leading role) to get the Pandemic under control, including through the UIP, which "played an important role in the federal government's response to the COVID-19 pandemic. The aim of the UIP was to reduce community spread of COVID-19 and ensure access to COVID-19 testing and treatment, and later vaccines." (Motion, p.3, fn 1, OIG Report No. A-02-21-01013 (July 2023), p. 21, available at https://oig.hhs.gov/documents/audit/6536/A-02-21-01013-Complete%20Report.pdf). HRSA further recognized that the UIP was "administratively designed to be most responsive to the pandemic's unprecedented impact and scale while *expeditiously reimbursing providers* serving uninsured patients." *Id.* (Emphasis added).

In short, with the UIP, the Government recognized it could not adequately respond to the COVID-19 pandemic on its own and that it needed the help of providers to conduct widespread testing of all individuals regardless of financial status. In exchange, the Government promised rapid disbursement of funds for the COVID-19 response through the UIP to those "heroes" that

stepped up, heroes like Crestview. Thus, unlike in *El Centro*, the Government assumed the significant responsibility of responding to a national emergency, enlisted the help of the private sector in its response, including by leveraging provider networks and infrastructure to fulfill its duties and promises to the American people and promising to pay providers who conducted uninsured testing through the UIP. By doing so, the Government was able to respond to the Pandemic's "unprecedented impact and scale, while expeditiously reimbursing providers serving uninsured patients." *Id.* This was a significant undertaking by Crestview and the fact that the Government did not have to test everyone through its own resources – and instead could leverage the private sector infrastructure and resources – provided a substantial *direct benefit* to the Government.

In its Motion, the Government asserts that any benefit to it would be "generalized." This, however, is incorrect as the benefit to the Government was not some future unknown reduced risk. Instead, the Government avoided having to set up its own testing or treatment facilities that was needed to reach every individual and instead could rely directly on the infrastructure already in place through the providers. The Government's reliance on *St. Bernard Parish Gov't v. United States*, 134 Fed. Cl 730 (2017) is misplaced. In *St. Bernard Parish*, a Louisiana parish brought suit against the U.S. for failure to pay the parish money for removal of sediment in the aftermath of Hurricane Katrina. The parish asserted the restoration of a natural resource and reduction in the amount of future spending by the U.S. for *future* potential flooding was the benefit that flowed to the Government. The court, however, found this was not the kind of direct, tangible benefit that would support the finding of an exchange between the parish and the U.S. As noted above, in the instant matter, the Government had declared a national emergency and determined that it needed to enlist the help of providers to carry out its intended plan to reign in the virus,

including by testing all individuals. Crestview answered this call, putting themselves and all their employees on the frontlines, risking illness and death during a time of great uncertainty, in order to help the Government achieve its goals of controlling the Pandemic. Crestview did this relying upon the Government's promise of payment for its work, for which it did receive payment for many months and many tests, until January 2022 when payments abruptly stopped (and some reversed out of their deposit accounts) without explanation. (Plaintiff's Complaint, ¶¶ 29 – 31). The Government determined it would respond to the Pandemic to get all Americans back to work and school. It relied on providers like Crestview in the depths of the Pandemic to do this by leveraging their network and resources to test all individuals. The Government avoided significant resource challenges in its response and was able to rapidly respond to the Pandemic to the benefit of all citizens. The Government very clearly received direct and tangible benefits as a result of the promises they made to providers.

In *Algonac Manufacturing Company v. United States*, 192 Ct. Cl. 649 (1970), a contractor brought a claim against the U.S. government seeking reimbursement for storage of a large unused armor plate owned by the U.S. government. The contractor, at the termination of a contract that involved the use of the plate, requested that the government remove the plate. *Id.* at 669 – 72. The government failed to do so and, after ten years passed, notified the contractor that the government was abandoning ownership interest in the plate. *Id.* at 670.

Under the terms of the preexisting written contract, the contractor had duties to maintain, protect, repair, and preserve the armor plate. *Id.* at 675 – 76. The court determined that because of those duties, the contractor reasonably concluded that it was obligated to continue to care for, preserve, and store such property even after the contract expired. *Id.* The court further determined that it was reasonable for the contractor to conclude that it would be compensated for

such storage by the government after giving the government notice of the fact that it (the contractor) was storing the plate. *Id.* at 676 – 77.

The court did not specifically state that the government had benefited from the contractor's storage. A benefit was clear, however, from the court's finding that the contractor had "stored and cared for the [government's] property for 10 years." *Id.* at 677. The court determined that the government's conduct had constituted assent to an implied-in-fact contract for the storage of the plate. *Id.* Similarly, here, the Government implored providers to step up and help the Government meet its goals by ensuring everyone, regardless of their economic situation, would be tested for COVID-19. The Government induced participation in the UIP with promises of payment should the terms of the program be met. The Government here accepted the benefit of Crestview's work and knew, or should have known, that Crestview expected compensation. Up until March 2022, almost a year after the work had been completed, the Government did nothing to dissuade Crestview from that expectation. As such, at a minimum, an implied-in-fact contract exists between the parties as pled in Plaintiff's Complaint. The Government's acceptance of the benefits of Crestview's work is evidence of such a contract. As further evidence of the existence of a contract, Crestview, starting in October 2020 began regularly submitting claims to the UIP and up to December 2021, was paid for its eligible claims through the UIP. The Government knew Crestview was not gratuitously rendering services to the Government and that there was an expectation, if it submitted eligible claims, it would be paid for testing for uninsured individuals pursuant to the UIP. As such, Plaintiff has adequately pled consideration as the Government received a direct benefit by avoiding necessary expenditures needed to sustain promised COVID-19 testing for every individual, including uninsured individuals.

### 3. Plaintiff has sufficiently alleged authority to contract

Crestview has sufficiently alleged the Government's authority to enter into a contract with it by referencing HHS officials and incorporating UIP Terms and Conditions specifically stating the Secretary of HHS would provide reimbursement for providers submitting qualifying claims. Notably, "a general allegation of authorization, liberally construed from the facts alleged in a complaint, is sufficient to withstand a motion to dismiss." *Arbitraje Casa de Cambio, S.A. de CV. v. United States*, 79 Fed. Cl. 235, 241 (2007) (citing *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1380 (Fed. Cir. 2001)). Further, whether the government representative in question had authority to bind the government is a question of fact which cannot be resolved in the Government's favor at the pleading stage. *See Leonardo v. United States*, 60 Fed. Cl. 126, 128 (2004) (noting that the court ordered "further discovery and briefing" as to the issue of "whether the government representative who entered or ratified the alleged contract had the authority to bind the United States"); *Hanlin*, 316 F.3d at 1328 (stating analysis of express or implied in fact turns on "nature of the evidence").

Here, Crestview has alleged facts sufficient to establish that HHS officials, through their actions as contracting agents for the United States, had the authority to bind the United States in contract to pay providers, including Crestview, for conducting COVID-19 testing of uninsured individuals through the UIP. (*See* Plaintiff's Complaint, ¶ 59). Additionally, throughout the series of documents, PowerPoint presentations, and UIP Terms and Conditions – which constitute the terms of the agreement between Crestview and the Government regarding the reimbursement of the UIP claims – the Government indicates that the "Secretary [of HHS, Xavier Becerra] *will* reimburse" providers for COVID testing claims submitted to the UIP. (T&Cs for FFCRA, Motion Appendix, p. A66 (stating "The Secretary *will* reimburse [Crestview]

generally at 100 percent of Medicare rates [ . . . ] for the COVID-19 Testing") (emphasis added); June 2021 T&Cs for ARPA, Motion Appendix, p. A78 (stating the same); December 2021 T&Cs for ARPA, Motion Appendix, p. A89 (stating the same); *see also* Webinar PowerPoint, Motion Appendix, p. A33 (stating "*As part of enacted legislation* [ . . . ] the U.S. Department of Health and Human Services (HHS) *will provide* claims reimbursement to health care providers for testing uninsured individuals for COVID-19") (emphasis added). Moreover, as recognized by the HHS, Office of Inspector General ("OIG"), HRSA, in the face of unprecedented challenges, implemented a program "to distribute funds to providers for COVID-19 testing and treatment for uninsured individuals in a fast and effective manner." (OIG report, *HRSA Made COVID-19 Uninsured Program Payments to Provider on Behalf of Individuals Who Had Health Insurance and for Services Unrelated to COVID-19*, (A-02-21-01013) (July 2023), p. 4, https://oig.hhs.gov/documents/audit/6536/A-02-21-01013-Complete%20Report.pdf; Plaintiff's Complaint, fn.4). HHS was responsible for program oversight and policy decisions, and HRSA, within HHS, was selected to administer the UIP. At a minimum, the above allegations of authorization, construed from the facts alleged in the Complaint, are sufficient to withstand a motion to dismiss.

The Government argues that Plaintiff has not pled in its Complaint a specific person with actual authority bound HRSA to pay Crestview's claims. In order to withstand a motion to dismiss, a plaintiff must allege facts which, if true, would prove the existence of a contract. The Federal Circuit has held that a general allegation of authorization, liberally construed from the facts alleged in a complaint, is sufficient to withstand a motion to dismiss. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1380 (Fed. Cir. 2001). In *Sommers*, the court specifically noted the following:

> [T]he complaint alleges that all of the acts complained of were committed by "duly authorized agents of the United States Department of Treasury, Internal Revenue Service." Moreover, the complaint alleged that when Mr. Sommers advised Agent Purvis of the five cents per gallon rebate that Mr. Vax offered to pay to Mr. Sommers, "Agent Purvis and Agent Purvis' superiors within the CID agreed that the Sommers Oil Company could retain the reimbursements from Mr. Vax." Mr. Vax made several rebate payments and, according to the complaint, the CID "knew of these reimbursements and acknowledged that those reimbursements were the rightful property of the Sommers Oil Company."
>
> The reasonable inference from the allegations in the complaint is that either Agent Purvis or his superiors were authorized to engage in or approve the actions alleged in the complaint, specifically, to promise Mr. Sommers that he would be permitted to retain the $41,000 rebate from Mr. Vax as consideration for his cooperation in the undercover investigation.
>
> *Id.* at 1379.

From these allegations in the *Sommers* complaint, the Federal Circuit found that while the complaint was "rather indirect in the manner in which it sets forth" the allegation of authority, it was reasonable to infer from the allegations in the complaint that there were several people who could have had authority to act on behalf of the government." *Id.* Similarly, here, Plaintiff may not have clearly alleged a specific person that entered into the contract with Crestview, but construing the complaint liberally, as a motion to dismiss requires the Court to do, and through documents fairly incorporated into the Complaint, Plaintiff has identified Secretary Becerra as the government official who had authority to enter into the agreement. (Plaintiff's Complaint, ¶¶ 58 – 59; *see also* T&Cs for FFCRA, Motion Appendix, p. A66 (stating "Secretary [Becerra] will reimburse [Crestview] generally at 100 percent of Medicare rates"); June 2021 T&Cs for ARPA, Motion Appendix, p. A78 (same); and December 2021 T&Cs for ARPA, Motion Appendix, p. A89 (same)).

Further, the case *Laudes Corp. v. United States*, 86 Fed. Cl. 152 (2009) is instructive. There, as here, the plaintiff alleged that government representatives had actual authority to bind the United States. The Government moved to dismiss, in part based on lack of authority. The *Laudes* court, denying the motion to dismiss, held that "[w]hether PCO officials had actual authority to bind the United States in an implied-in-fact contract is a genuine issue of material fact which precludes dismissal of counts 1 and 4 at this time." *Id.* at 164. Although the Government, like here, claimed that the plaintiff's allegation was insufficient, the court rejected this argument stating, "a general allegation of authorization, liberally construed from the facts alleged in a complaint, is sufficient to withstand a motion to dismiss [ . . . ] Plaintiff has alleged facts sufficient to establish that PCO officials, through their actions as contracting agents for the United States, had the authority to bind the United States in implied-in-fact contracts to facilitate and obtain payments [ . . . ]. Accepting these allegations as true and drawing all reasonable inferences in favor of Plaintiff, the Court denies Defendant's motion to dismiss counts 1 and 4 based on Defendant's assertion that PCO officials lacked the authority to enter into the implied-in-fact contracts at issue." *Id.* (internal citations omitted). Similarly, here Plaintiff plausibly alleges that agents of the Government, including Secretary Beccera and other HHS agents, had authority to bind the Government in contract with Crestview. That is all that is required at the pleading stage and the Court should deny the Government's motion to dismiss on this basis.

Notably, neither of the authorities relied upon by the Government permits dismissal *at the pleading stage* based on lack of authority. The case *H. Landau & Co. v. United States*, 886 F.2d 322 (Fed. Cir. 1989) cited by the Government in its Motion was a summary judgment case in which the court had the ability to weigh evidence as to authority, and even there, the court remanded to the trial court to consider implicit authority in addition to actual authority. In *City of*

*El Centro v. United States*, 922 F.2d 816 (Fed. Cir. 1990), the case actually *went to trial*. Moreover, the court noted that in a "situation [ . . . ] in which emergency action must be taken by government agents to protect life and property, [ ] an implied authority to obligate government resources" may be found. *Id.* at 821. That is precisely the scenario at bar. Here, in stark contrast to *Landau* and *El Centro*, Plaintiff has not had the benefit of discovery. Its well-pled allegations, along with incorporated documents, can be taken as true that the Government had authority to enter into a contract and this is sufficient to withstand dismissal at this stage. Alternatively, if the Court finds that more specific allegations may be required, the Court should grant leave to allow Plaintiff to amend its Complaint.

### D. Crestview has Plausibly Pled a Money-Mandating Statute in Support of Count IV as Statutes Can Become Money-Mandating where the Government Adopts Guidelines or Documents Creating a Mandate

Crestview has sufficiently pled Count IV in its Complaint as even if a statute is not money-mandating on its own, it can become so when it is adopted and implemented by a government agency. Courts have recognized that when a statute or regulation is interpreted concurrently with agency guidelines and documents, the agency can establish a framework mandating payment. *Monzo v. United States*, 2013 WL 6235608, at *2 (Fed. Cl., Nov. 27, 2013, No. 12-724C); *Roberts v. United States*, 745 F.3d 1158, 1166 – 67 (Fed. Cir. 2014). In *Monzo*, the court noted that while a statute alone might not inherently mandate payment, the addition of agency program guidelines can create such a mandate. *Monzo*, 2013 WL 6235608, at *2. As is pled in Plaintiff's Complaint, once these guidelines are adopted and implemented, the agency effectively surrenders the discretionary authority initially granted by the statute, creating a regulatory framework that requires payment after meeting certain qualifications. *Id.*; Plaintiff's Complaint, ¶ 77.

In its Motion, the Government also cites *Price v. Panetta* 674 F.3d 1335 (Fed. Cir. 2012) in support of its assertion that the UIP Funding Laws provide substantial discretion to the agency and, therefore, are not money-mandating. (Motion, p. 16). That, however, is not where that rule ends. *Price* goes on to state that:

> a statute or regulation that provides for payment of money can qualify as money-mandating if the plaintiff's claim is that the statute or regulation creates a right to payment upon a showing that the plaintiff qualifies for that payment by satisfying designated statutory or regulatory requirements.

*Id.* at 1339.

Thus, in determining whether a statute is money-mandating, the Court is not limited to looking at the plain language of the statute alone. Here, by providing the proscriptive UIP Terms and Conditions, HRSA has relinquished the discretion that the CARES Act and subsequent statutes *may have* provided. Notably, the court's analysis in *Monzo* provides a guideline for determining whether a statute and its supporting documents are money-mandating. In short, a court should consider the following elements: (1) whether there is a statutory or regulatory basis for payment; (2) whether there are qualifications or criteria for payment; (3) whether the language either mandates or implies payment; and (4) whether there are criteria for who is eligible for payment. *See Monzo*, 2013 WL 6235608, at *3 – 4. All of these elements are present in the instant matter.

First, the UIP Terms and Conditions and the FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration ("UIP FAQs"), clearly illustrate the conditions and criteria for payment, including: detailing the services that are eligible for reimbursement (UIP FAQs, Motion Appendix, p. A10), what services are ineligible for reimbursement (UIP FAQs, Motion Appendix, p. A11), the limitations for filing claims (UIP FAQs, Motion Appendix, pp. 11 – 12),

how providers can receive funding (UIP FAQs, Motion Appendix, pp. A18 – 19), how to submit eligible claims (UIP FAQs, Motion Appendix, pp. A19 – 20), how reimbursement rates are determined (UIP FAQs, Motion Appendix, pp. A21 – 23), how the payments received from the UIP should be treated for purposes of cost reports and similar reports (UIP FAQs, Motion Appendix, p. A25), and many other conditions and criteria for the program and payment.

Additionally, the UIP Terms and Conditions promise payment once the specified criteria are met. Most notably, the UIP Terms and Conditions, supported by other documents like the Webinar PowerPoint and the UIP FAQs, specifically state that providers "will provide claims reimbursement," which firmly establishes an affirmative obligation on the part of the Government and mandates that payments be made to participating providers who meet the requirements. (See, *e.g.*, Motion Appendix, pp. A33 and A66). Additionally, the language in several sections of the UIP Terms and Conditions underscores the Government's duty to act, as evidenced by the repeated use of the phrase "the Secretary will reimburse the Recipient generally at 100 percent of Medicare rates," which implies that reimbursement is not discretionary but mandatory once the specified conditions are met (Motion Appendix, pp. A66, A78, and A89.) This repeated use of "will" in reference to reimbursement signals a binding commitment by the Government to reimburse funds. "You can use 'will' to create a promise – a contractual obligation." See Bryan A. Garner, A Dictionary of Modern Legal Usage 941-942 (2d ed., Oxford U. Press 1995). When used in this way, "will" is not merely stating a future event, it is creating a promise to perform.

Finally, the UIP documentation outlines the steps required for participation, specifying that a provider must attest to having checked for healthcare coverage eligibility, accept the defined reimbursement as payment in full, agree not to bill the patient, and agree to the UIP

Terms and Conditions (See, e.g., UIP FAQs, Motion Appendix, pp. A18 – A19). Crestview has pled it complied with these requirements and thus, a contract was formed. (Plaintiff's Complaint, ¶ 28.)

The documents published by the Government on the UIP collectively establish a money-mandating source for reimbursement of fees. Crestview is an eligible provider who tested COVID-19 samples pursuant to the obligations under the UIP. As stated in Plaintiff's Complaint, Crestview complied with the UIP's Terms and Conditions, including registration in the online portal (Plaintiff's Complaint, ¶ 58). Crestview's more than 70 employees at one point worked an estimated hundreds of thousands of hours supporting the Government during a time of crisis and one of its greatest times of need. (Plaintiff's Complaint ¶ 25.) In return, Crestview only asks that the Government uphold its promises and fulfill its obligations under the agreement it made. This is the public-private partnership that so fiercely depends on trust in the government as a fair partner.

### E. The Government's Position on the Obligated Payments Due to Crestview is not Relevant to this Motion and, in any event, is Without Merit

In its Motion, the Government highlights the FRA, enacted on June 3, 2023, to support its argument that there are no available funds to pay Crestview for claims it submitted well before the UIP shut down on March 22, 2022. The Government contends that Crestview has no ability to seek damages in this case as a result of the passages of the FRA. The Government's Motion also asserts unfounded statements that Crestview's claims are not obligated or, in some circumstances, were "de-obligated." As an initial matter, these arguments are not relevant to a motion to dismiss. Crestview has adequately pled that the payments are obligated and any disagreement with these allegations are intended to be addressed in discovery.

Further, the Government is obligated to pay Crestview's claims. The Government made a definite commitment to pay for services received by the uninsured. The Government's commitment to reimbursing testing services constitutes its agreement or legal liability to pay and is the documentary evidence required by 31 U.S.C. § 1501(a). Crestview has adequately pled that an obligation was created by virtue of the Government's actions. (Plaintiff's Complaint, ¶¶ 23, 27-29, 46-54 and 55-64). Crestview pled that it agreed to the UIP Terms and Conditions, that it followed the UIP Terms and Conditions to determine the uninsured individuals were (to the best of its knowledge) eligible to receive testing services, that the COVID-19 testing services met the criteria for the UIP, and Crestview submitted the claims months before the shut-down of the UIP portal. HRSA also expressed certainty in multiple UIP documents that it "will" provide claims reimbursement to providers and committed to expeditiously (within 10 to 30 business days from submission of the claim) reimburse valid UIP claims submitted prior to the UIP portal shut down. As alleged in Plaintiff's Complaint, HRSA characterized the failure to pay Crestview for the submitted claims as a "payment pause" indicating that the payments were in progress, and thus obligated. (Plaintiff's Complaint, ¶¶ 38 and 41).

In *Local Initiative Health Authority for L.A. County v. United States*, 142 Fed. Cl.1 (2019), the court determined that the government's obligations were based on the presence of *quid pro quo*. The government provided subsidies to insurers selling health plans on ACA health benefit exchanges. As the court noted, the government offered specified incentives in return for the voluntary performance of private parties such that the incentives were not discretionary. *Id* at 16. Similarly, in this case, the Government incurred a binding agreement due to the "*quid pro quo*" exchange between it and Crestview. Here, the Government offered expedited reimbursement in return for the voluntary testing services furnished by providers who were

heroes during the Pandemic – these "incentives" were not discretionary.

Additionally, the Government contends, without any legal support, that $3.4 million in payments deposited in Crestview's accounts and reversed (without explanation or notification) before the Assessment based on the Government's "payment pause" were "de-obligated." (Motion, p. 34). As with many of the Government's arguments, however, this factual dispute cannot be resolved at the motion to dismiss stage. The Government does not cite any authority which permits dismissal of the claim for the $3.4 million in question as a matter of law, only a definition in the GAO glossary, and an allegation in the Complaint that makes no references whatsoever to "de-obligation." At this point in the case, there is no evidence that the Government de-obligated the funds by cancelling them or adjusting the previously incurred obligation to pay these claims. In fact, the opposite is true since the Government contends it reversed these deposits to hold the payments (described as a payment "pause" by the Government) pending the Assessment – which was delayed by the Government for two years. There is simply no basis or authority for dismissing part of Plaintiff's claim (for approximately $3.4 million) simply because the Government has labeled the payment as "deobligated" in its Motion without any evidence and the Court should disregard this argument.

## IV. CONCLUSION

Based on the foregoing, and as Plaintiff's Complaint alleges, the UIP funds were obligated and should have been paid to Crestview. Crestview, having fulfilled its obligations by providing testing services to uninsured individuals that met the program requirements for the benefit of the United States, is entitled to payment for its services. Even if HHS argues it no longer has available funds, the Judgment Fund, a permanent appropriation of the US Treasury, may be used by the Government pay any judgment (or settlement) in this case.

For the reasons submitted herein, the Court should deny the Government's Motion in its entirety.

Dated: January 24, 2025

Respectfully submitted,

Elaine F. Harwell
Procopio Cory Hargreaves & Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tele: 619-238-1900
Fax: 619-235-0398
Email: elaine.harwell@procopio.com
Counsel for Plaintiff

OF COUNSEL:
Diane M. Racicot
David Gouzoules
Procopio Cory Hargreaves & Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tele: 619-238-1900
Fax: 619-235-0398
Email: diane.racicot@procopio.com
david.gouzoules@procopio.com